RECEIVED
SDNY PRO SE OFFICE

2024 OCT 16  PM 12:13

UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF NEW YORK

ADAEZE NWOSU  VS.  HILTON WORLDWIDE INC et al

NOTICE OF REMOVAL / TRANSFER OF VENUE

Comes now the plaintiff files this notice of removal from the United States District Court for the Eastern District of Virginia. for bias under 42 USC 1441. The plaintiff originally filed this case where most of the companies are headquartered. However because of the prejudice ideas the plaintiff has evidently faced in the DC metro area courts, she has to file/remove the case to a venue where in the defendants still operate Please see attached certiorari that is contemporaneously filed.

Respectfully Submitted

ADAEZE NWOSU.
16 OCT 2024

RECEIVED

16 PM 3:22

In the United States District Court
for the
Southern District of New York

US DISTRICT COURT SDNY

COMPLAINT.

| | |
|---|---|
| Adaeze Nwosu | * |
| 1802 Vernon St | * |
| Washington, DC, USA 20009 | * |
| *Plaintiff* | * |
| | * |
| T: 2028554226 | * |
| E: ireoma@gmail.com | * |
| | * |
| | * |
| v. | * CIVIL ACTION NO: |
| | * |
| 1. Hilton WorldWide, Inc. | * |
|    1775 Tysons Blvd FL 7, McLean, VA, 22102 - 4285, | * |
|    USA | * |
|    <u>Registered Agent:</u> | * |
|    Corporation Service Company | * |
|    251 Little Falls Drive, Wilmington | * |
|    New Castle, DE, 19808 | * |
|    ***Defendant 1*** | * |
| | * |
| 2.  Chris Song | * |
|    950 New York Ave NW, Washington, DC 20001 | * |
|    ***Defendant 2*** | * |
| | * |
| 3.  Nancy Orlarei | * |
|    950 New York Ave NW, Washington, DC 20001 | * |
|    ***Defendant 3*** | * |
| | * |
| 4.  Marriott International, Inc. | * |
|    7750 Wisconsin Avenue, | * |
|    Bethesda, MD, 20814 | * |
|    <u>Registered Agent:</u> | * |
|    The Corporation Trust Incorporated | * |
|    2405 York Road | * |
|    Suite 201 | * |
|    Lutherville Timonium MD 21093-2264 | * |
|    ***Defendant 4*** | * |
| | * |
| 5.  The Ritz-Carlton Hotel Company, L.L.C. | * |
|    Registered Agent | * |
|    Corporation Trust Center 1209 Orange St, | * |
|    Wilmington, New Castle, DE 19801 | * |
|    ***Defendant 5*** | * |

6. Roman Dauze
   Tysons Corner,
   1700 Tysons Corner Blvd, McCleans, VA
   *Defendant 6*

7. Emma Poplin
   3100 S St , NW, Washington, DC 20007
   *Defendant 7*

8. Rishi Malhotra
   3100 S St , NW, Washington, DC 20007
   *Defendant 8*

9. David Morrison
   1100 Pennsylvania Avenue NW, Washington, DC
   20004
   *Defendant 9*

10. John Doe(s)  and/or John Doe(s) Inc/Corp/LLC

*16 October 2024*
\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**Jury Trial Demanded**

**Complaint: Fraud (constructive & actual), Unjust Enrichment, Harassment, Gross Negligence, Unfair Business Practices, Breach of Implied and Express Warranty, Violation of Anti-Trust Acts**

1. *Background of Parties,*

1.1.   Ms Nwosu (Plaintiff) is an international businesswoman, maintaining a portfolio of global businesses across the hospitality, luxury lifestyle and marketing industries. She is a "Diamond" member (the highest tier membership) with the Hilton Hotels Corporation and has had vast experience as a guest with the hotel, across their different brands across three continents, in Africa, Americas and Europe on her business travels. As a self-employed, working class professional woman, her stays are self-funded, meaning her expenses are not subsidized or funded by an employer. Ms Nwosu began repeatedly staying with the hotel chain in December 2022 after she was impressed by her Hilton stay in the Seychelles Mahé Island. Since 2023, when her gold jewelry was stolen at the Hilton Munich, Germany, Ms Nwosu has noticed a persistent decline in services afforded guests meanwhile the Hilton Worldwide Holdings annual gross profit has been steadily increasing since 2022: from (c. $7 billion to c. $9 billion in 2023).

1.2.   According to their SEC statement, "the Hilton Worldwide, Inc "Hilton" is one of the largest and fastest growing hospitality companies in the world, with 5,284 properties comprising 856,115rooms in 105 countries and territories as of December 31, 2017. Our premier brand portfolio includes: our luxury and lifestyle hotel brands, Waldorf Astoria Hotels & Resorts, Conrad Hotels & Resorts and Canopy by Hilton; our full service hotel brands, Hilton Hotels & Resorts, Curio - A Collection by Hilton, DoubleTree by Hilton, Tapestry Collection by Hilton and Embassy Suites by Hilton; our focused service hotel brands, Hilton Garden Inn, Hampton by Hilton, Tru by Hilton, Homewood Suites by Hilton and Home2 Suites by Hilton; and our timeshare brand, Hilton Grand Vacations. As of December 31, 2017, we had approximately 71 million members in our award-winning guest loyalty program, Hilton Honors."

1.3.   Defendants 2 and 3, namely Chris Song and Nancy Orlarei respectively, were employees of Defendant 1's subsidiary, Conrad Hotels and Resorts, located at 950 New York Avenue, Washington, D.C, and participated in fraud and conspiracy to

defraud the plainitff during the plaintiff's stay in July 2024. Both parties were relocated to the Washington D.C. Conrad Hotel in May/June 2024, after the Conrad Hotel & Resorts Midtownin Manhattan New York failed to uphold five star luxury hotel standards, in just four short years, and was derobed of its Forbes Five Star "Certification" in 2024. Ms Nwosu had stayed at the then Conrad Midtown New York, on May 4 2024, complained to its front desk manager of its below standard services. Following lapses in service qualities, 1 month later on June 4 2024, the Hilton withdrew its managegment services, and the property was scooped up by Marriot International, Inc, *defendant 4,* in defendant 1's stead. The plaintiff also brings a discrimination claim against defendant 2 for harassment, conspiracy and fraud while she was a guest on the property in June 27 2024.

1.4.   Defendant 4, the Marriott International Inc., is the parent company of Defendant 5, The Ritz-Carlton where the plaintiff also stays since 2023 on business trips to the District of Columbia, and is a competitor to Defendant 1. Like Defendant 1, the plaintiff has substantial evidence over the course of her stays for illegal activities such as fraud, breach of contract, unjust enrichment, breach of implied and express warranty *inter alia.*

1.5.   Defendant 6, 7, 8 are employees of Defendant 5, who conspire to comit fraud against the plaintiff, and discriminate against the plaintiff, and breach contractual agreements provided by defendant 4's loyalty programs

1.6.   Defendant 9, the John Does, are for unknown members, who participated in the torts against the plaintiff and whom she does not know at the present time, and is listed for ease of serving summons at a later time.

2.   *Nature of Action*

2.1.   The plaintiff brings this action/complaint of fraud (constructive and actual), breach of express and implied warranty, breach of contract, unjust enrichment, negligent misrepresentation, civil conspiracy for fraud and aiding and abetting such fraud, thereof, harassment, antitrust violations and violations of the consumer protection act for Virginia, and the District of Columbia, where the torts occurred, and/or under 18 U.S. Code § 1346 - Definition of "scheme or artifice to defraud" and 18 U.S. Code § 1349 - Attempt and conspiracy.

2.2.    The plaintiff brings these aforementioned counts against the defendant 1 – 3, in her capacity as a Hilton "Diamond" member, the highest membership category, shy of lifetime Diamond, after having experienced multiple of the corporation's brands portfolio worldwide and spending in excess of $50,000.00 in repeated stays with the Hilton since December 2022. In this capacity the plaintiff has experienced, rather unfortunately, a repeated lapses in service qualities, some of which, like negligence and theft ended up being proximate causes for $400,000 loss by the plaintiff. The plaintiff files this suit timely based on her concatenation of her experiences since 2023, which demonstrates the defendant 1's substitution of consumer centric, hospitality service for corporate greed. Since in 2022, Defendant 1's profit increased by $2 billion dollars, while the plaintiff has witnessed its leased, managed and owned properties succumb to disrepair; cutback in basic amenities and basic service standards, including housekeeping and cleaning standards in its flagship Hilton brand, all the while positing that such brands like the Hilton are full service.

2.3.    The plaintiff brings similar complaints against defendants 4 – 8 in her capacity as a Marriott Bonvoy "Gold Elite" Member, wherein she has experienced precarious and frivolous implementation of the alleged Gold Elite benefits, that the availment of such warranties become akin to "playing the house" and are albeit illusive and fraudulently misrepresented.

2.3.1.  For defendants 1 and 4, the plaintiff learned its employees are incentivized and/or rewarded and/or promoted based on actual cash sales, causing them to jettison ethics, warranties of loyalty programs, and plainly defraud and harass guests, engage in illegal pricing such as baiting and switching, while they falsely advertise to bait consumers into joining their fraudulent loyalty programs. Ultimately, defendants 1 and 4 have crafted a likely ponzi scheme, where they, the parent companies, are the players of the ponzi/pyramid scheme, and the unsuspecting consumers are the later investors and the employees are the early investors who benefit from kickbacks, payoffs at the expense of the unsuspecting consumers, like the plaintiff.

2.3.1.1.  "Bait and switch" advertising is grounds for an action of common-law fraud, unjust enrichment, and sometimes breach of contract. A "bait and switch" is also a violation of the Consumer Fraud and Deceptive Business Practices Act.

2.3.2.   (1) the seller represented in its initial proposal that they would rely on certain specified employees/staff when performing the services; (2) the recipient relied on this representation of information when evaluating the proposal; (3) it was foreseeable and probable that the employees/staff named in the initial proposal would not be available to implement the contract work; and (4) employees/staff other than those listed in the initial proposal instead were or would be performing the services.

2.4.   The suit also brings anti-trust violations for various unethical pricing such as <u>inadequately justified</u> dynamic/yo-yo pricing, *allegedly* using Artificial Intelligence, which but serves to obscure transparency in pricing, promotes unjustified inflationary pricings and diminishes consumer's hard earned disposable incomes. In fact, other states have banned and/or are attempting to ban these sort of runaway pricing schemes that serve to devalue unjustly consumer dollars and drive unnecessary inflation, and because of its potential violations of Sherman 1 and 2 Acts, and actual violations of the Clayton Act see <u>https://spectrumlocalnews.com/nys/central-ny/politics/2024/03/01/n-y--lawmaker-introduces-bill-amid-wendy-s-planned-dynamic-pricing</u> and <u>https://www.restaurantdive.com/news/new-york-state-ags-proposed-rule-could-restrict-dynamic-pricing-new-york/644208/.</u>

2.5.   Thus, this complaint also contains anti-trust violations vis a vis, the Clayton Act and The Robinson Patman Act, as both parent companies engage in never ending acquisitions and conversion of hotel brands under their portfolio, stifling competition and limiting choices for travelers, flattening the distinction between luxury, and midscale hotel chains to their cost advantage, all the while providing substandard service delivery across all hotel brand categories.

2.6.   This suit is timely as lapses in the breach of contract, and failure to honor its warranties by the 1st and 4th defendants have already been adjudicated and settled in favor of the plaintiffs, See case Elder vs. Hilton 2017, yet these defendants refuse to learn from their previous mistakes, thus compelling this similar case's requirement for more stringent punitive damages.

3.  *Jurisdiction*

3.1.   The plaintiff brings this complaint into the District Court for Eastern Virginia based on federal question jurisdiction under 28 USC 1331: Federal question because the district courts have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. The defendant 1 is a Delaware corporation **headquartered** in Eastern Virginia with location 1775 TYSONS BLVD FL 7, Mc Lean, VA, 22102 - 4285, USA. Defendant 4 is headquartered in Maryland, and owns/operates hotels in Eastern Virginia, such as defendant 5, the Ritz-Carlton L.L.C with a branch located at 1700 Tysons Boulevard, McClean, Virginia, where torts were also committed against the plaintiff. Federal jurisdiction is appropriate as both holding companies have branches /subsidiaries along state lines and engage in interstate commerce.

4.   *Counts & Violations*

4.1.   Fraud/Misrepresentation, Negligent Misrepresentation against defendants, pursuant to US Code 18 U.S. Code § 1346 Scheme or Artifice to Defraud and 18 U.S. Code § 1349 – Attempt & Conspiracy,

4.2.    Harassment against defendant 2

4.3.   Breach of Virginia Consumer Protection Act of 1977, Breach of DC Consumer Protection Act

4.4.   Negligence, Gross Negligence, Wanton Negligence

4.5.   Unjust Enrichment

4.6.   Discrimination and Violation of Common Law Inn Keeper Laws

4.7.   Breach of Implied, Express Warranties (Breach of Contract)

5.   *Statement of Claims*

5.1.   The flagship Hilton brand gained popularity with upper middle class baby boomer Americans as a dependent brand that could deliver 4-star hotel quality at 2 star prices. Marriott, a rival grew popular on a similar branding style. In recent years, both companies have pursued an aggressive acquisition strategy to appeal to luxury consumers, like the plaintiff and gen Z and millennials[1].

---

[1] See summary of Marriott's acquisitions here including expansions of luxury portfolios st. Regis, and defendant 5, Ritz Carlton, L.L.C

7

5.2.    The problem now is that the reverse is true, wherein defendant 1 and 4 are acquiring and expanding brands which they <u>advertise</u> as luxury and running them like 2/3 star hotels, including defendant 5, because they evidently cannot uphold the standards expected of the luxury hospitality of their boutique rivals, to which customers are acquainted, and even which their advertisements promise. This is evident in defendant's one closures of its luxury hotels due to lackluster and/or substandard service delivery, as evident in the Conrad Midtown New York, which the plaintiff personally experienced, her lackluster experience in the Waldorf Astoria Rome Cavalieri Resort in May 2024, where the bathroom upon check in was hardly operational, and in Waldorf Astoria in/around June 5th 2024, wherein the plaintiff checked into a dirty unvacuumed riddled room with fresh carpet stains and visibly unclean bath that was permanently stained. These just mark the experience of the plaintiff, non inclusive of the publicly available complaints of deplorable standards in similar Waldorf Astoria in Edingburgh, Scotland which was forced to drop the luxury Waldorf Astoria brand in June 2024, to a curio collection, after a persistent string of complaints since 2022[2]. The Curio collection hotels are a 6 foot drop **downgrade,** from the Waldorf Astoria, and just adds further evidence of Defendant's inability to operate as a luxury chain despite persistently misleading customers and raising expectations[3].

| *Figure 1 Excerpt from Hilton 2021 SEC filing showing ranking of its brands* |
| --- |

---

[2] https://www.tripadvisor.com/Hotel_Review-g186525-d188782-Reviews-or20-The_Caledonian_Edinburgh_Curio_Collection_by_Hilton-Edinburgh_Scotland.html

[3] https://www.thecaterer.com/news/caledonian-edinburgh-curio-collection-hilton



*Figure 2 String of poor reports of the struggling Waldorf Astoria in Edingburgh,*



*now Curio Collections*

*Figure 3 Evidence of duplicitous practices by the hilton from other customers*



*Figure 3 Evidence of duplicitous practices by the hilton from other customers*

5.3.   The general manager from the failing Waldorf Astoria in Edinburgh, Dale McPhee was brought in to run the failing Conrad Hotels in DC this May 2024, which had evidently been running without a general or operations manager. In the press, the Hilton publicly <u>conceals</u> its luxury management and operational failures to deliver the services it advertises with rosy, omissive and misleading verbiage: *"The property will also be rebranded into a Curio Collection by Hilton hotel in a move that would "provide an opportunity for the Caledonian to further elevate its heritage and position", the group said[4]."*

5.4.   Under Virginia law, a plaintiff seeking to recover for fraud must allege: "a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 477 (4th Cir. 2006) (citing Richmond Metropolitan Authority v. McDevitt Street Bovis, Inc., 256 Va. 553, 507 S.E.2d 344, 346 (1998)). A claim for constructive fraud requires the same allegations, except instead of pleading that the false representation was made intentionally and knowingly, "the plaintiff is only required to plead that the false representation was made innocently or negligently." Sales v. Kecoughtan Hous. Co., 279 Va. 475, 690 S.E.2d 91, 94 (2010). In addition, "[a]n action.

5.5.   Similarly under District of Columbia law, in order to state a claim of common law fraud (or fraud in the inducement) under District of Columbia law, a plaintiff must plead that: The defendant made a false statement of material fact <u>with knowledge of its falsity</u>; and/or with the intent to deceive ("Where a party innocently misrepresents a material fact ... without reasonable grounds for believing it to be true […] such representation will support an action for fraud.") (citations omitted); Restatement (Second) of Torts § 539(1) (1977),  as cited in *Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of the United States, 258 F. Supp. 3d 1 (D.D.C. 2017).* Under District of Columbia law, a misrepresentation is material if either:  (a) It is likely to induce a reasonable person to manifest assent. (2) The  defendant knows that it is likely to induce the recipient to manifest assent  (*Id*). Under federal law, 18 U.S. Code § 1346, scheme or artifice to defraud, the U.S Supreme Court, US v. Rybicki, 354 F. 3d 124 - Court of Appeals, 2nd Circuit 2003 upeld the code includes a scheme or artifice to deprive another of the intangible right of honest services

---

[4] https://www.thecaterer.com/news/caledonian-edinburgh-curio-collection-hilton

5.6.    With regards to the Virginia Consumer Protection Act of 1977, Consumer transaction" means:

5.6.1.  " 1. The advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes;

"Goods" means all real, personal or mixed property, tangible or intangible.

"Services" includes but shall not be limited to (i) work performed in the business or occupation of the supplier, (ii) work performed for the supplier by an agent whose charges or costs for such work are transferred by the supplier to the consumer or purchaser as an element of the consumer transaction,

"Supplier" means a seller, lessor, licensor, or professional who advertises, solicits, or engages in consumer transactions, or a manufacturer, distributor, or licensor who advertises and sells, leases, or licenses goods or services to be resold, leased, or sublicensed by other persons in consumer transactions.

A. The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;

In any action brought under this subdivision, the refusal by any person, or any employee, agent, or servant thereof, to sell any goods or services advertised or offered for sale at the price or upon the terms advertised or offered, shall be prima facie evidence of a violation of this subdivision.

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction"

16. Failing to disclose all conditions, charges, or fees relating to:

a. The return of goods for refund, exchange, or credit. Such disclosure shall be by means of a sign attached to the goods, or placed in a conspicuous public area of the premises of the supplier, so as to be readily noticeable and readable by the person obtaining the goods from the supplier. If the supplier does not permit a refund, exchange, or credit for return, he shall so state on a similar sign."

5.7.    **Fraud (Ponzi Schemes) and Breach of Implied & Express warranty (Breach of Contract) & Deceptive Pricing Practices (Unfair and Deceptive Trade Practices), Negligence**

12

5.7.1. The plainitff avers that the defendants 1 and 4 breached Code of Virgirnia § 8.2-313: Express warranties by affirmation, promise, description, sample, [wherein] *(1) Express warranties by the seller are created as follows:*

> *(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.*

> *(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.*

> *c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.*

> *(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.*

5.7.2. The defendants 1 and 4 conducted the acts listed in clause 5.7 by repeatedly denying upgrades, gifts, concessions, violating their terms and conditions at material times when the plaintiff attempted to avail of the warranties provided by their loyalty point systems, in her status as a "Diamond" Hilton Honors member and "Gold Elite member,

5.7.3. The plaintiff has been repeatedly denied upgrades at the Hilton being informed that certain rooms are exlcuded for upgrades although these are not advertised, and are omitted from the welcome letters and adverts on the company's website of the benefits of the loyalty programs

5.7.4. Defendants 1 and 4 also incentivize staff to deny one upgrades by rewarding them/ promoting them based on actual cash sales so consumers are unsuspectingly blocked from availing of their points, and instead are steered away or outrightly defrauded.

## 6. Statement of Facts/ Plaintiff's Affidavit in Support of Counts against named Defendants

6.1.   Plaintiff string of poor and fraudulent experiences at Defendant's 1 Conrad Hotel & Resorts brand, including the plaintiff's stay at the Conrad, Washington, DC June 22 – July 1, 2024 and the Conrad in Algarve, Portugal in May 2024.

6.2.   During her first stay at the Conrad Washington DC, from June 16th June – 23rd June 2024, Ms Nwosu had paid for the Sakura lounge, whose added lounge fee provides breakfast and dinner.

6.3.   Ms Nwosu stayed in a 800sqft suite with a park view, receiving lots of natural sunlight, and despite the summer heat and large glass windows, the room stayed cool because of the functioning AC.

6.4.   During the course of her stay, Ms Nwosu observed that hotel employees were in the practice of coming to the lounge during lounge hours or shortly after and sneaking food prepared for guests out of the lounge for their personal consumption

6.5.   By their acts of sneaking food out, i.e. trying to hide take away packs of food and walking briskly out of the lounge, and/or carrying plates into the lounge toilet, Ms Nwosu knew they knew their practices of taking what was reserved for guests were wrong and inappropriate, especially in a 5 star hotel.

6.6.   The staff being able to avail of guest food Ms Nwosu had to bay at least $300 a night for, plus extra $300 for the Sakura lounge constitutes a violation of consumer protection laws because unbeknownst to Ms Nwosu, the Hilton had an alternate avenue to availing of such amenities without paying – all Ms Nwosu had to do rather than waste her hard earned money was greet people in the lounge as an employee and clean up after guests.

6.6.1.   When she asked Nancy Orlarei if there was an alternate path to obtaining the same amenities without paying for them, and again re-exposing the illicit behavior of the staff, Nancy did not respond to Ms Nwosu's complaint. This act alone violates Virginia consumer protection act § 59.1-200 (8) whereby defendant 1 advertised goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised

6.7.   Ms Nwosu also noted that her turn down services, which is part of the services she had paid for, and *expected,* at the hotel, were missed and/or incompletely done by the turn down staff. On one night, she informed Mr Edwards, who mentioned all the housekeeping staff had closed for the day, but would ensure they serviced her room for the rest of her stay.

14

6.8.    However, turn down services remained lackluster, at times trash wouldn't be taken out, the bed would not have been serviced, the nightly gifts not placed, or ice would be missing, or the drapes not closed. Thus, the services she was paying for and expecting, was not being delivered, and when done, were below the hotel's recognized standard, and which the staff admitted, and yet could not sufficiently correct and render, if at all. This is in violation of Virginia consumer protection act § 59.1-200 6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model.

6.9.    The final straw that broke the camel's back on this stay, was when Ms Nwosu sought to extend her stay and avail of her Hilton honors points. To this effect she had notified the front desk manager, Mr Edwards, to close out the existing booking so her points would post ontime and she could redeem it. However, on 21st June, Mr Edwards gave Ms Nwosu lots of excuses, and said his work phone broke that morning, and did not see her messages requesting the stay to be extended and redeemed with points, and ensuring she booked the right room category through the app, to retain the same room. Ultimately, though Ms Nwosu went ahead and made a fresh reservation through the app, she was yet debited or a stay at a full cash rate of over $1000, unbeknownst to her, and without her authorization.

6.10.   This came, after Ms Nwosu complained to the front desk manager, prior checking in that it seemed the Hilton staff grieved customers who booked with points because they either try to withhold the complimentary upgrades they advertise by telling them rooms are not available, or steering them away to reserve their points for later and pay cash instead. While Mr Edwards tried to reassure her that was not her practice, on June 16th 2024, when she initially checked in, it ended up manifesting as explained in the aforementioned clause.

6.11.   Subsequently, after complaining for the unauthorized debit on her card, and the lapses in services, including omitted and substandard services, Chris Song and the Guest Relations Manager, Alejandra, initially tried to offer Ms Nwosu 40,000 points and a free night's stay in a standard room. Ms Nwosu declined the offer, stating she was similarly offered 40,000 points in the Conrad Midtown, NY, in May 2024 and instead told them to improve their services and give her a refund. Unfortunately, the Conrad Midtown closed for lapses in service standards and omissions anyway. Ms Nwosu mentioned she wasn't interested in points to patch poor service and that the reasons she opted for "5 star hotels" was so she could focus on the business she was

in town for, get it done in a timely manner, and be assured that she would not be distracted with poor service experience

6.12. In this case, both the guest Relations manager and the assistant front desk manager, Chris song, ceded that truly the standards Ms Nwosu had met, were not the hotel's standard, and conceded to give her a partial refund and assurance that on her next stay she would **not witness the lapses she had seen on this stay, and would take steps to remedy the situation** and invited her back to the hotel in DC the following week, when she would return to town. Ms Nwosu took them for their word.

6.13. On/Around June 26 2024, Ms Nwosu returned to DC and wrote to Chris Song, Nancy Orlarei the Director of Rooms, and Alejandra specifically asking if the services issues and omissions, she had witnessed, had been fixed prior to booking. Chris assured her in writing that they had been addressed, and welcomed her booking.

6.14. However, the next morning after the night she had checked in, Ms Nwosu saw yet again, hotel staff sneaking food reserved for guests into the bathroom of the lounge. Such acts of taking what belonged to guests, by staff was extremely sensitive for Ms Nwosu as a staff member had stolen Ms Nwosu's 3 day old one of a kind gold jewelry in Hilton Munich, 2023, and thus made Ms Nwosu extremely worried about the safety of her affairs, if the problem still persisted and the staff(s) they had allegedly cautioned continued.

6.15. Ms Nwosu promptly brought the breach in service standard and behavior to the director of rooms, Nancy Orlarei after leaving the hotel to conduct her affairs. When Crucially, when Ms Nwosu confirmed from Nancy Orlarei that same day, that staff had no special permission to conduct such, she **asked for a refund immediately in writing on the stay given that she had just stayed one night out of the four nights**

6.16. She also brought to Nancy's attention the non-working AC in the <u>living room</u> and copied Chris and Alejandra

6.17. While Ms Nwosu was out of the hotel Nancy did not respond, and neither did Chris or Alejandra. Ms Nwosu just assumed they were taking care of the lapses and did not want her to check so she concentrated on her affairs.

6.18. When she returned later in the evening back to the hotel room, she was surprised the room was still hot, her laundry had neither been picked up or returned, and there was no response whatsoever from Nancy or Chris or Alejandra.

6.19.   Confused, yet tired, she wrote to Nancy to elicit a response on her complaint, and Nancy wrote her a one liner saying someone would fix the <u>AC in the bedroom.</u>

6.20.   Ms Nwosu returning from a long day, was exhausted and perplexed as to why there had been no resolution, meanwhile staff were checking in guests as normal and no one said anything to her. Eventually she instructed Alejandra to check her phone with regards to the complaint. Alejandra mentioned she was off duty and could not address the recurrent lapses either, and simply referred her back to Nancy and Chris who were on duty and copied on the e-mail, and her assured her they would take care of her complaint

6.21.   Ms Nwosu ceded, and decided to focus on her affairs throughout the business week, which she was in town for, trusting the hotel staff would not have lured her back to the hotel under false pretenses, and without intending to improve as they had mentioned. She left the hotel in the morning for her business in the morning, came back in the evening, yet her room was ever hot.

6.22.   In fact two of the Hilton employees who entered her room, Mr Roberto, and the housekeeping staff noted her room was uncharacteristically hot and apologized for the inconvenience.

6.23.   On Sunday June 30th, Ms Nwosu reported to a front desk staff, Mr Odingas that her room was still very hot, and he came up and witnessed that the AC in the living room was set to a lower temperature than the AC in the bedroom, yet was still not cooling as well.

6.24.   Odingas called on the radio for engineering to come to the room immediately, and upon arrival, the **engineering staff mentioned that was the first time,** he had received a request to that room for a non-working AC and **showed Ms Nwosu** the engineering room fixing requests for the past week; Notably, her room, room **1014, was not on there.** Thus, although Nancy, Alejandra and Chris all made Ms Nwosu believe that they had been sending engineering to her room and that her room air conditioning was fixed. **<u>This was a lie.</u>** The only reason Alejandra was not listed as a defendant was because she was off duty, and would had been relaying information based on input from Chris and Nancy.

6.25.   Ms Nwosu then reported the matter to Chris in person, whom she had been copying but had not seen physically until then. He mentioned he had been made aware of the matter, and offered Ms Nwosu a <u>fan.</u> It was then she knew Nancy and Chris had deceived her and conspired to defraud her all along. <u>Their silence, though</u>

pretending to fix issues, had been intentional. They had lured her back to the hotel on the assurances that the lapses in services were addressed, wherein they actually were not, and carefully omitted that they had no intention of fixing them, all the while recognizing Ms Nwosu is busy during the day. So their ploy evidently was to stall her, under pretenses, so as to not issue a refund and then mention that she had used the facilities, which is exactly what happened. See clause 4.2.29

6.26.   In fact Mr Song, took it upon himself to try to prove to Ms Nwosu that her AC was working, but because her room faced the sun it could not cool. Notwithstanding that at least three other staff had concluded that the room was uncharacteristically hot, and that Ms Nwosu's previous room from her previous stay, which had faced the sun and had more glass window cooled just fine.

6.27.   When Ms Nwosu refused Chris obvious lies, she told him she was stressed by all of this and was checking out and wanted to be alone. Chris insisted on following her to her room to the engineer, prove that the AC was working well.

6.28.   Ms Nwosu repeated to Chris that three of his staff, and herself had all born witness to the fact that the living room is HOT and the AC cannot cool it, and that no engineering had come all along, and she was not permitting anyone anymore since she wanted to rest and check out.

6.29.   Chris insisted on entering the elevator with her to the 10th floor and followed her. **Irritated from what had risen to harassment, since Ms Nwosu had asked Chris to leave her alone,** but he refused disrespectfully, under the guise of pretending to fix her issue, though he had 3 days already. Upon noticing Chris followed her from the lift on the 10th floor and was **still** walking behind her to her room, after she had asked him to **stop,** she went down to the third floor lobby and met with the concierge, Ms Yvette Faulk, and recounted her stay and asked to leave and find an alternative. Ms Faulk concluded that Ms Nwosu was entitled to a refund and should not have witnessed **any** of the lapses in services **again**. She agreed to call an alternate hotel, the Waldorf Astoria, in the morning, when their managers would be back, to ensure they had fixed their issues and Ms Nwosu could be transferred to a hotel within the Hilton brand in the morning. She also promised to escalate the complaint with Dale McPhee the general manager.  Odingas mentioned Ms Yvette was discussing with Chris privately, and would call her room to confirm everything before she left, and advised Ms Nwosu could go upstairs.

6.30.   Later that evening, Ms Nwosu waited and did not receive a call from Ms Faulk. Instead, she received an email from Chris stating that **he would not honor a request for a refund because Ms Nwosu had used the facilities.**

6.31.   Upon returning to her room, she noticed the turn down service had been done, but **once again improperly and incompletely.**

6.32.   Ms Nwosu mentioned she would sue for she had been effectively defrauded, and defrauded under conspiracies by the staff at the Conrad, especially Nancy and Chris, who had known of the issues of the previous stay, did nothing on subsequent stays though pretended to so, just so they could stall Ms Nwosu to stay longer and steal her money under false pretenses and by willful acts of omission, and deceptive utterances. The staff at the Conrad clearly had **no intention of improving their services, stopping lapses in quality standards, theft, etc and all the shortcomings Ms Nwosu had pointed out on her previous stay, and again on June 26th 2024, which Chris assured her they would have taken care of. All was a fraudulent misrepresentation. This violated** Virginia consumer protection act § 59.1-200, 6,7,8.

6.33.   On July 1 2024, Ms Nwosu followed up on her complaint with Ms Faulk and the general manager dale McPhee, but neither responded.

6.34.   Ms Nwosu checked out a day early, and yet she was still billed the full amount, and lost also the dollar equivalent of the points (over $1000), she had used for the booking (Exhibit 1).

6.35.   Chris and Nancy's fraudulent actions in over billing her made her recall how the Conrad, Algarve Portugal had overbilled her for pet fees and security deposit in excess $750, even though she had settled her bill, and the daily pet fees etc were already included in that invoice, which she had settled. The Conrad Algarve attempted to justify the charge, and instead emailed Ms Nwosu proof that she had authorized that amount using someone else's credit card.

6.36.   Ms. Nwosu explained the billing was wrong because they had charged a card unbeknownst to her and only found out because she noticed unrecognized charges on a card she had not authorized.

6.37.   Although the Conrad Algarve had a printout of her invoice, with the charges fully settled, they never refunded her the excess of $750 amount (exhibit 2). Ms Nwosu was forced to file a charge back but soon forgot about it because she had other countries to travel to on her agenda.

19

<u>Falsely Advertised Services and Repeated Lapses in Quality Standards at the</u>
<u>Waldorf Astoria in Rome and DC</u>

6.38.   Ms Nwosu has had over 5 3-day or more stays at the Waldorf Astoria, DC between 2023 – 2024, and used to be her go-to hotel whenever she had to be in DC. However, there would be lapses by staff upon check in, and the more she stayed, the more she noticed the hotel falling into disrepair such as little yet important things that make a 5 star hotel, 5 star: curtains began to drop off the curtain rack, furniture like sofas would be missing from how it was advertised on the Hilton website, and <u>door viewers for security would be blocked with tissue,</u> because the glass was broken and their slippers became cheaper, their laundry papers became photocopies instead of actual three ply papers with the carbon copies beneath (see images from plaintiff's stay on January 17th 2024).

6.39.   Ms Nwosu reported these drop in standards to Mr Crosby, a front desk staff, their long time concierge Fahad, who mentioned they would try to fix these lapses in service, security, and quality standards for her next stay.

| *Figure 4 cheap slippers* | *Figure 5 broken security door viewer, clogged with tissues* |
|---|---|
|  |  |

6.40.   However, Ms Nwosu's next stay was worse. When she checked in June 2022, she checked into a dirty room, the room was not vacuumed, there was visible hair in the

tub, the tub that was previously always white had now developed stains and there was trash on the floor from the previous stay.

6.41. This time, she was offered a complimentary upgrade by David Morrison, defendant 9, the front desk manager to a $2000 suite for the night, instead of her $800 room, as a bait, since it would be complimentary for that night only, and subsequently they would switch the price. MS Nwosu declined the offer asked for a refund on the first night because of the gravity of oversight of checking into a dirty room, and drop in standards. She asked that the tub be fixed as this was her preferred room, and was already noted on her profile, so she did not want to go through hassles of seitching

6.42. In an email on June 6th, 2024, she explained such lapses in drop in advertised luxury standards are costly on her time because then they try to get the housekeeper, director of housekeeping to speak with her, apologizing and eating into time meant for her business and she was not just going to keep condoning substandard services with placating yet patchy solutions such as points and upgrades (Exhibit 3).

6.43. Ms Nwosu told the director of housekeeping to replace the stained tub, since she mentioned the stains could not come out and admitted yes previously, they were not there but had started to develop across tubs in the hotel.

6.44. Ms Nwosu mentioned for the price of a suite for the night, the could easily buy a new one.

6.45. Though they admitted the lapse in service standard, what happened next was very telling of defendant's 1 inability to understand and run 5 star luxury. A front desk staff called Ms Nwosu, _whilst her do not disturb sign was on_, to inform her that the price of her room had increased to $1000+ for the following night, then David, defendant 9, made an offer to downgrade her, _and still not fix the tub, or even provide any assurances or give a time frame with which it would be fixed._

6.46. Additionally, when Ms Nwosu first tried to book the stay, _before checking in,_ she was told by the sales team that they offered discount rates for extended stays. She was surprised when they tried to continuously upsell her by offering various discounts on higher priced suite rooms, for up to half, the price _after_ she had checked. This was totally misrepresentative of the facts she had been advised in email, that they offered no discounts on extended stays. Of course, Ms Nwosu relied upon the no-discount information she was given before she checked in and had already shortened her stays based on the information she was given (exhibit 8). These evident misrepresentations were fraudulent.

6.47.   This misrepresentation added with the drop in standards, lack of care for service quality, and prioritizing the bottom line, the disruption and inconvenience, overwhelmed Ms Nwosu to the point that she wouldn't stay at the Waldorf Astoria in DC again. Notably, the hotel manager, Mr Jamal Simington only half-heartedly attempted to reach out to her *after* she had checked out, and when she responded later, he never responded again.

6.48.   Notably, this drop in 5 star standards in DC was consistent with what Ms Nwosu had experienced on her vacation at the Rome Cavalieri – A Waldorf Astoria hotel in Rome in May, 2024.

6.49.   Just one year prior in May 2023, Ms Nwosu had a good stay at the hotel, prompting a return the following year but was dismayed by the poor service and drop in amenities.

6.50.   She was informed that the coffee machines in the hotel rooms were now reserved only for the 8th floor *Imperial rooms,* and had been removed from the other floors.

6.51.   She checked into a room that had severe plumbing issues such that the bidet, the shower and the toilet were not working properly.

6.52.   Eventually after waiting for over 6 hours, they were able to *finally switch her room.*

6.53.   However even the basic standards of the bed  preparation dropped – the bed had no duvet, and Ms Nwosu could not even sleep but was woken up repeatedly:



Figure 6 substandard quality of bed at Waldorf Astoria Rome Cavaliari which the plaintiff had to sleep on and endure poor night's rest because of slow, poor resolution and negligent hotel standards

6.54.   Rather than handling her complaints, like the Conrad the Rome Cavalieri Waldorf Astoria, kept silent, stalled. In fact one day Ms Nwosu got a bill envelope slipped under from the cashier stating she had unresolved charges, when in fact she did not because she had authorized her credit card to cover incidentals.

6.55.   Ms Nwosu also noted that the welcome gifts that were given to other guests, were not given to her. In fact when she spoke to the front office Manager about it, the manager lied that they don't have those type of gifts anymore, and when Ms Nwosu insisted she had seen it with her own eyes being given, the Manager conceded and mentioned she would send them up to her room.

6.56.   At Rome Cavalieri Waldorf, the misrepresentation was not just reserved to the rooms but also to the spa services. For example Ms Nwosu would book a deep tissue 80 minute massage, and be given a 50 minute Swedish massage, like she would not know the difference. And when she spoke with the spa staff about and asked to speak with the Spa Director, the front desk staff, said she would call the manager, yet instead called a therapist, presenting her to Ms Nwosu as though she was the manager.

6.57.   Eventually the same staff member called the manager/spa director, who was equally confounded as why his staff, understanding Ms Nwosu's request lied and presented someone to her that wasn't the director of spa services.

23

6.58.   Thus, Ms. Nwosu did not have much of a vacation as she was constantly battling to get the full amenities, and luxury standard that she had come to expect and what she paid for, throughout her stay and this cost her stress, loss of money because she did not get what she paid for. For example, Ms Nwosu, on instruction from the physiotherapist for a mandatory repeat session based on the injuries to the muscles in her body, had to stay another night, at her own expense because the spa staff, at her own discretion, elected to lie to Ms Nwosu and cut her sessions, and book her for the wrong types of therapies.

6.59.   The drop in service standards and misrepresentation, while raising prices, is not limited to the Hilton's luxury brands but also the Hilton hotels. According to the Hilton's SEC filing's description of the brand, "the Hilton hotels are our upscale, <u>full-service</u> hotels that typically include swimming pools, gift shops and retail facilities, meeting and banquet facilities, restaurants and lounges, room service, parking facilities and other service"

6.60.   In the plaintiff's experience this is a bold faced lie / misrepresentation, with the exception of Hilton's outside the USA, Hiltons' within the USA do not offer <u>full service.</u> In fact they don't even clean your room anymore – they offer "housekeeping" in theory whereby housekeepers push carts around like make – belief meanwhile they don't even clean the bathrooms. She noticed this omission in service in the downton Hilton in Denver in June 2024 and again in the Capital Hilton in July 2024.

6.61.   There is nowhere advertised on the booking website this removal, or scaled down version of cleaning service, which most people have come to expect in 3 star hotels.

6.62.   In fact, the plaintiff began staying at the Hilton because it advertised heavily its clean stay program post COVID, and had seen it implemented in their hotels in Quebec and Munich in 2023. See <u>Hilton Clean Stay</u>



*Figure 7* Hilton Clean Stay Advert, also publicized on television adverts

6.63.  She was surprised thus, when the housekeeper came to "clean" her hotel room in Denver 2024, and within 5 minutes she was done. The plaintiff noted the bathroom was left uncleaned, sheets unchanged, floors unvaccumed, and this was her third night in the hotel room. The housekeeper mentioned her instructions were just to spray some air freshener, take out the trash, replace the towels and straighen out the bed. Besides a bathroom cleaning solution, she had no other disinfenctant for the

6.64.  In fact when she had checked in at night in June, she was surprised that as she laid down the bed was **wet.** Because there were no housekeepers and no similar suites available, she was just given a blanket to cover the wet bedsheet until the morning.

6.65.   On about June 26th 2023, after complaining to the operations manager on  Ruben Membreno the operations manager said the Hilton stopped **its Clean Stay program silently, unbeknownst to Consumers.**

6.65.1.   The plaintiff discovered in her stay in July 2024 at the Capital Hilton, that now, the Hilton **charges customers for cleanliness,** with its new program called <u>Pure Rooms,</u> advertising some hypoallergenic unprovable construct for additional charges.

6.65.1.1.   The Pure Rooms are sold to hotel chains like defendants 1 and 4 and proudly advertise up charging customers for cleanliness, as a means to gain "competitive advantage

6.65.1.2.   The Pure concept involves insider dealings as it is marketed by a former Marriott and Hilton manager, Haley Payne who is now selling cleanliness, under the guise of wellness, as an upsell marketing room category to the hotels of defendant 1 and 4 in the USA.



*Figure 8 Pure Room Wellness Ad seen in Capital Hilton on 1001 K Street, July 12 2024*

26



Figure 9 advert for pure wellness showing increased incremental revenue for hotels from pureroom.com

6.65.2. The Pure concept involves insider dealings/kickbacks as it is marketed by a former Marriott and Hilton manager, Haley Payne who is now selling cleanliness, under the guise of wellness, as an upsell marketing room category to the hotels of defendant 1 and 4 in the USA.

6.66.  Ms Nwosu knows firsthand the importance of having clean air in the room as part of all hotel room offerings, especially in hotel chains above three stars and describe themselves as upscale, full service or luxury or advertise publicly about the cleanliness of their stay.

6.67.  On February 6th 2024, in staying in a room with the 4th / 5th defendant in Tysons corner, her nose began to bleed because of the poor quality of the HVAC and at the lack of cleanliness of the air vent, which prompted an early check out

6.68.  In January 2024, when staying with the 4th /5th defendant in Ritz Georgetown location, the plaintiff was forced to also check out early because they could not fix

their HVAC system. During the night the plaintiff had began wheezing and had runny noses due to poor HVAC quality. The plaintiff avers she suffered personal respiratory injuries because of the poor air qualities in these locations.

6.69.   The defendant 6 apologized and said the vents will be cleaned and the smell of the HVAC fixed for her next stay, however this was not the case. Upon returning to the 4/5[th] defendant in Ritz Tysons Corner - Virginia, this July 2024, she checked into room 1411, an executive suite and the HVAC odor was still present. Ms Nwosu then asked for a humidifier which did not help, and eventually a staff offered to transfer her to another suite, suite 1511, which did not have the smell. Not only were these problems not fixed, as defendant 6 had promised, but was still causing the same inconveniences like last time more than 6 months later. Thus , the luxury standards defendant 4/5  were advertising were simply not luxury at all. They simply misled the plaintiff by lying to her that they intended to fix problems with their hotel, which they had not intention of fixing, yet the plaintiff relied upon such information and promises of improvement, returned and paid money to that effect to stay in the hotel based on false promises of the defendants 1,2,3,4,5,6.



| Figure 10 dirty air vents from defendant 5, Tysons corner, emailed to Roman Dauze, General Manager on February 6 | Figure 11 Blood from the nose of Ms Nwosu taken as a result of poor HVAC and air quality in the suite in defendant 5, Tysons corner |

6.70.   In June 2023, while on her business tour in Europe, Ms Nwosu's gold bracelet was stolen from a hotel room in Defendant 1 at the Hilton Munich City located at Rosenheimer Str. 15, 81667 München, Germany, for which she had stay back extra

days in Munich to file a police report (exhibit 4), speak with the police and the defective and miss a court case in the USA. This missing of that trial date has in part cost her in excess of $400,000.00.

6.71. The Hilton staff were slow to respond to the incident, repeatedly questioning Ms Nwosu on whether she had indeed left the item in the hotel. It was when the bracelet was not on as she checked out, but was on the previous night when she returned from Stuttgart, after a meeting with Mercedes Benz, that they began to take her claim seriously, and testified that only she and the housekeeper had been into the room. Prior to that they had vouched for the housekeeper, holding him out to be their employee of 7 years to Ms Nwosu. Ms Nwosu had to extend her stay for at least 2 extra days to comply with investigations to try to retrieve her newly bought 18 karat gold Firenze cut bracelet. **She paid for these stays,** the Hilton did not even as much offer nights off, for her losses. It was after she extended the stay, and noticed disgusting cleaning housekeeping standards, including using water from the toilet bowl and toilet brush to clean the seats of the toilet, and using guests face towels to wipe the floor that she noted the housekeepers were not even Hilton employees.

6.72. Thus, the Hilton general manager, front desk staff, and operations manager, all stalled in calling the police, reviewing the cameras, for over 2 days after the incident, because they were **negligently vouching for a person who was not even their employee, all the while misrepresenting to Ms Nwosu as though he was,** for the sake of dissuading her from believing she had lost the bracelet on site.

6.73. Ms Nwosu never retrieved her lost bracelet until this date or corollary expenses

6.74. She returned to the US in June 2024, and immediately had to begin taking care of business. At her stay at the Waldorf Astoria, she happened upon the Hilton corporate management conference, and obtained the contact of the head of security after recounting both the housekeeping lapses, and negligent violation of inn keeper common laws that resulted in her losses of her bracelet and corollary expenses.

6.75. John, the head of security took heed to her feedback to her housekeeping and Ms Nwosu noted that they intended to improve their standards. He also redirected her to Hilton's internal insurance, Chubb, for Europe. Unfortunately, because the price of gold fluctuates as a commodity, Ms Nwosu could only provide the market value price of the bracelet, and as the seller of the bracelet noted to her on email, the

bracelet was no longer available and would not be remade by the goldsmith until further notice. Thus, Ms Nwosu could not recoup the cost of her lost bracelet.

6.76. Ms Nwosu's contracts with the Hilton during the time of theft is sufficient to satisfy inn keeper common laws, whereby the hotel owes a special duty to guests in their hotel under common law doctrines of inn keeper laws, *Novak v. Cap. Mgmt. and Dev. Corp.*, 452 F.3d 902, 911 (D.C. Cir. 2006). This prerequisite of duty is one of the fulfilled elements of the claims, which the plaintiff pleads for the tort of negligence on the part of defendant 1.

6.76.1. Additionally, on July 16 2024, the Capital Hilton committed fraud for when Ms Nwosu asked before checking in and paying for a room, whether they cleaned the bathrooms daily in this property, the front desk staff assured Ms Nwosu, Yes they cleaned bathrooms daily. She sought clarification after her harrowing and misrepresented experience in Denver 2024 when she found out the Hilton's daily cleaning services were skeletal and pretentious at best.

6.77. In fact the Capital Hilton was so filthy, that Ms Nwosu saw at least three well fed jumbo size rats this July 2024 on the property line, and in the garden of their Capital Hilton, and when she reported it to the front desk staff, they simply said the rats are <u>outside,</u> i.e. The staff knew fully well they had a rodent infestation on their property, but were unbothered, did not advice guests of the rodents infestation though the only thing blocking the rats from entering inside was an automatic sliding door.

6.77.1. Ms Nwosu not only holds that the hotel committed fraud but in fact was **unjustly enriched** because although Ms Nwosu checked out early after seeing the rats repeatedly and witnessing the skeletal housekeeping services, they refused to provide her with a refund on her unused night, though she asked for it.

6.77.2. As aforementioned, the promises of improving the housekeeping services were false, defendant 1 evidently cut housekeeping budgets worldwide, and scaled down cleaning services. For example, instead of changing sheets every other day, the Hilton now changes sheets on the 5th night / 6th day, as told by Ruben the operations manager at Denver and as outlined by the plaintiff, it does not even clean the bathrooms, while advertising as a full service upper upscale nonetheless. These instructions are coming from the same corporate office in Virginia, some of the staff whom Ms Nwosu met in June 2023, and **pretended to take her feedback.** Apparently, this bewildering experience is not limited to Ms Nwosu's experience

alone. See below similar experience of the hotel's negligence and **gross negligence in upholding advertised standards.**

*Figure 12 Similar experiences of deceptive skeletal housekeeping practices being noted by other Hilton staff*



6.77.2.1.    For advertising as full service, the Hilton Downtown Denver and the Capitol Hilton Washington DC did not even the basic amenities such as ear bud cleaners, which they say guests can request if needed. They did not even have the note pads and Ms Nwosu was given this random book as a concession when she asked for a Hilton writing pad in Hilton Denver , and this is supposed to be a full service hotel catering to business travelers who would need such.  Ms Nwosu returned the book, and the operations manager sympathized with her frustration of the corporate's penurious slashing of budgets at the expense of

guests, under false pretenses, and escalated her complaint to Hilton corporate - who did nothing.



Figure 13 concessionary notepad given to Ms Nwosu in Hilton Denver because of lack of amenities.

6.78.   None of these "scaled down" skeletal services are advertised anywhere in the Hilton's policy. The plaintiff holds that her claims satisfy not just fraud but also the violation of the DC and Virginia Consumer protection acts. The Denver City Hotel goes a step further claiming it has a business center though there is none. What they have is a UPS store, a completely separate business entity for which the guests must pay separately. Ms Nwosu relied on this misrepresentation/omission in services, and chose the Hilton when booking, in part because of its advertised business service center. Ms Nwosu incurred unforeseen costs and expenses as a result.

6.79.   Not only are the aforementioned acts fraudulent and in violation of the Virginia Consumer Protection Act, but they are also in violation of the DC  Consumer Protection Acts code 28-3904 Unfair or deceptive trade practices, whereby it shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to:

6.79.1. (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; in this case with regards to 5 star standards, cleanliness, having full service ammenities, providing housekeeping, and (d) represent that

32

goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another; **(f)** fail to state a material fact if such failure tends to mislead;

6.79.2. **(f-1)** use innuendo or ambiguity as to a material fact, which has a tendency to mislead; **(h)** advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered;

6.79.2.1.   In fact, the Waldorf Astoria which is historiccaly known to be a 5 star brand, could not even make 5 star status when the Hilton took over the former Trump Hotel, and converted it to a Waldorf Astoria. It was rated a 4 star hotel.

33



Figure 14 Series of screenshots showing that on the Hilton website there is no mention of scaled down housekeepng services between luxury and upper scale and mid scale hotels listed, there is distinction or enumeration. This ommision is fraudulent as it leaves guests perplexed and surprised.

Figure 15 Denver city hotel advertising they have a business center when in fact they do not have that ammenity for guests to avail of freely as is expected. They fradulently advertise UPS services as theirs

34



35



*Figure 16 embassy suites is a lower category tier than waldorf astoria yet the policy on housekeeping is unclear*

*Figure 17 Waldorf astoria and embassy suites have similar advertised services without any clarity of variation in housekeeping services*

36

7. With regards to the counts in clause 5.7 **Fraud (Ponzi Schemes) and Breach of Implied & Express warranty (Breach of Contract) & Deceptive Pricing Practices (Unfair and Deceptive Trade Practices), Negligence,** Ms Nwosu confirmed about the ponzi scheme being run by the corporate head offices of defendants 1 and 4.

7.1.   When she checked into the Hilton Denver around June 23 2024, she sought to book a suite and asked the front desk staff, *Troy,* which category below she had to book in order to qualify for the upgrade, as per the rules of the Hilton Honors rewards program

7.2.   After telling her the category she had to book, he then created a lie, unbeknownst to the plaintiff at the time, that he could not book the category below because the system would not let him, and she had to pay for higher category the room directly

7.3.   Tired, Ms Nwosu conceded though she though it was odd. After taking care of her business, she followed up with an assistant front desk manager about the encounter, and the assistant front desk manager, Reine, affirmed her suspicion that Troy had indeed lied to her, to get her to pay more and **deny her the benefits she was entitled to, under the warranties / contracts created by the rewards programs.** Ms Nwosu suffered loss, inconvenience, charges distractions as a result of these illegal acts by the defendants

7.4.   Similarly, defendant 5 – 8 breached their warranty programs when Ms Nwosu paid with her points, and yet they asked her to pay an $1000.00 for an upgrade to a suite this July 1st 2024.

7.5.   Ms Nwosu had initially conceded but later upon checking out she reviewed the terms and conditions of the loyalty program for Marriott Bonvoy and she found that there were no exclusions barring upgrades with points as the general manager Roman Dauze had presented to her (exhibit 5).

7.6.   In fact, Roman had enganged in bait & switch pricing, when Ms Nwosu advised she needed to extend her stay and asked since she would staying for more than 14 days for a fair rate. Roman said he understood, then asked her to book to reserve the room, and he would see what he could do with rates to avail her of a discount. Ms Nwosu pushed back, and said that he should let her know first so she can make a decision given the cancellation fees. But Roman insisted she book first, and she should not worry Thus, it was her understanding, and based on the practice of the defendant 4, given long stay discounts, beyond the listed prices, that she conceded.

7.7.    After booking and obtaining a confirmation number, Roman switched on her. He told her she had booked the best available rate and then tried to get her to stay to the end of the week, to see what he can do and "Discuss with his team" citing it was out of his hands, *all after she had extended a stay and obtained a confirmation number.* He did not mention any of this prior, and Ms Nwosu has this all on text.

7.8.    Ms Nwosu also recounted this deceptive practice by the Ritz Carlton Georgetown in June 2024, when the front desk manager,

7.9.    Poplin lied to her that there were not suites available for her intended dates, wherein fact they were and the general manager upgraded Ms Nwosu.

7.9.1.    Emma's lies had been so malicious because she knew Ms Nwosu needed space and Ms Nwosu had advised if the suite was not available she would not extend her stay. So when she advised Ms Nwosu that there was no suites and Ms Nwosu mentioned she would checkout, Emma replied "Perfect." Meaning that she intended fully to deprive Ms Nwosu of a stay that was available and deny her the privileges to which she was entitled.

7.9.2.    Ms Nwosu on second thought, before checking out, thought to check with the general manager on the availability of the suites because already, she had been lied to by front desk staff that the Ritz brand does not do upgrades, which she knew for fact was untrue, because she'd been upgraded at Ritz Carltons prior.

7.9.3.    Sadly this was not the first time Ms Nwosu had to experience humiliation at a Ritz. In Tysons corner, Ms Nwosu returned from an outing only to be told that she had been downgraded, and was locked out of her room. She was informed by the front desk staff that the upgrade had only been for one night, not the entire stay – contrary to the Gold Elite Terms and Conditions which advertised it was for the entire stay. Ms Nwosu had to suffer, tired, arguing before the front desk manager came out and apologized for the "inconvenience." Parker, the then valet staff, mentioned he had <u>never</u> seen that happen to any guest, further alluding to defendant's 4 negligent and discriminatory practices in seeking to extort unjustifiably Ms Nwosu and deprive her of her benefits.

7.9.4.    At no point in time did Emma or Rishi mention the Ritz $2000, which the Ritz Carlton brand is historically known for: allowing for a budget of $2000 to cater to the unique needs of their guests and keep them loyal

7.9.5.  At no point in time did these staff from defendant 4 mention the $200.00 Ms Nwosu would have been entitled to, as part of her gold Elite Member status, should she not be able to avail of the benefits of her gold elite status (see exhibit 5).

7.9.6.  Emma also refused to change Ms Nwosu's welcome gift when Ms Nwosu mentioned she had allergies to certain fruit, thought the hotel could readily provide alternatives. Ms Nwosu asked Emma publicly in the front lobby at least twice, and knew for certain other gifts like wine/chocolate/cheeses could have been provided. Emma just sought to deny Ms Nwosu service.

7.10.  It is defendant's 4 and 5's practice to minimize expenses, even in luxury and find ways to defraud guests, and maximize profits.

7.11.  For example, the managers purport that the rate jukes are due to demand alone when the rooms are fully booked, but unkionwn to guests, the Ritz Tysons give staff guest accommodation from available inventory, and this too uses up their inventory and contributes to a sold out hotel and rate hikes on unsuspecting guests. Ms Nwosu saw Sera, the concierge and Madison, a front desk staff check into rooms during her stay.

7.12.  In Barcelona Hilton Diagonal Mar, the front desk manager denied Ms Nwosu her upgrade, Meche Aragones, and even went further to profile her stating it was weird that she arrived at the night without a reservation

7.12.1. Ms Nwosu explained that her flight took off in the evening and she does not reserve in advance due to stringent cancellation polices, and especially in new hotels she has not stayed in before she wasn't to ensure the standard

7.12.2. Ms Nwosu ended up checking out early because of the racial profiling and also because the HVAC in her suite was not working, and there were bugs coming out of the worn bathtub in the suite she paid for.

7.12.3. Ms Nwosu paid over $700 for the highest suite after being denied her upgrade, though receiving a welcome letter that did not say anything about such exclusions of room categories. In this case <u>the higher category room was available so Ms. Nwosu should not have been denied her upgrade</u>. See below, figure 18:

---

*Figure 18 actual copy of welcome letter showing benefits with no mention of exclusions on room categories from Hilton Diagonal Barcelona, Spain in May 2024*

---

39



7.13.   Similarly on July 3rd 2024, Ms Nwosu noted that at the Waldorf Astoria, in Washington D.C , David Morrison, a new front desk manager from the Hilton Midtown, came implement their duplicitous practices in the DC luxury brand.

7.13.1.1.   Specifically, Mr Da'Ron Crosby checked Ms Nwosu in, and noted on her profile that she preferred 721, and whenever she came she was upgraded to that room as per her complimentary upgrade Diamond member benefits.

7.13.1.2.   David Morrison, the new front desk Manager in 2024 tirelessly worked, and would send Mr Da'Ron Crosby, his junior to Ms Nwosu's table even whilst she was having breakfast, to try and downgrade her room under the guise of it having a cleaner amenities, rather than fix the defunct amenities in her room, just so they could sell the higher category room immediately, despite its defects. Ms Nwosu knew this because she had specifically told Mr Morrison to work to fix the bath tub, carpet stains asap and did not want to be inconvenienced with switching rooms.

7.13.1.3.   Mr Morrison had also tried to offer Ms Nwosu 40,000 points and she refused, and specifically stated this was not one of the times she would tolerate going to a higher category room as a patchy resolve; she insisted they simply needed to sell what they advertised and fix the problems.

7.13.2.   Similarly, the Rome Cavalieri front desk manager, Nicholas, told Ms Nwosu he spent the past 4 hours assigning room bookings, when Ms Nwosu visited the hotel in May 2024

7.13.2.1.   He had wanted Ms Nwosu to stay in a faulty room with faulty bathroom than reassign her room.

7.13.2.2.   Ms Nwosu could not enjoy her holiday or night's stay after hearing Mr Nichols lies trying to convince her that her room was upgraded because it was a higher floor, despite there being no such category type. He, like Mr Morrison, and Chris Song, did everything possible, including wear Ms Nwosu out trying deceive her and deny her Hilton diamond honor benefits, which she availed of last year, twice when she visited the Astoria. Mr Nichols even tried to stop her from escalating her complaint. Like the 2nd and 9th defendants, Ms Nwosu never met Mr Nicholas last year when she stayed at the Waldorf Rome Cavalieri and must be part of the Hilton's mission to deceive consumers, limit their ability to avail of its advertised benefits, breach their implied and expressed warrant contracts, and reward their managers for sales revenues

7.13.2.3.   Ms Nwosu noted that at the Rome Cavalieri, would note their preferences on their bookings were waiting long hours to check in as they would first be given a room that was not noted in their preference and then have to insist, wait and

essentially fight for the room they want to have it given. For example, a guest had wanted a room on the Imperial floor, and noted that on his booking with two daughters. Ms Nwosu who had asked for that room was told it was not available. Eventually she watched the guest wait and fight for that room, and then it became available.

7.14.   Ms Nwosu suffers from psychological injuries that manifest physically as upper back/shoulder muscle fatigue/aches/injury. Such injuries to her body result from of undue stress such as in the case of having to confront these duplicitous managers. On all occasions, she had to expend more money booking extra physiotherapy sessions as a consequence of dealing with unexpected stress of these lying managers and fraudulent practices of the defendants to breach their express and implied warranties.

## 8.   Further Breaches of Express & Implied Warranties through Deceptive Trade Practices and Fraud

8.1.   In the past year, Ms Nwosu has noted an increase in room categories, in order to diminish the value of the rewards program and make it harder to avail of room category upgrades

8.1.1.   For example, once checking into the Waldorf around January 17 2024, she was initially given an accessible room as an upgrade, because it had a bigger square footage, and because it was on a higher floor, though it was the same type of room.

8.1.2.   Then, the higher category up, was a grand room, and Ms Nwosu argued that a higher floor was simply a "preference," not a different room category type; and that a slightly bigger room with the same layout and amenities, was effectively the same category type.

8.1.3.   Eventually, she was upgraded to an actually different category room with a different layout, but not after she insisted.

8.1.4.   Later, When Ms Nwosu tried to book at the Conrad, Ms Nwosu noted, that a higher floor preference, was listed as a separate room category type, that one could be upgraded to. This is simply an unfair practice, because a higher floor has nothing to do with the actual room size and layout. In fact, sometimes, Ms Nwosu prefers lower floors when traveling with her dog because it is easier to get out, but because of all the changes, a higher floor, instead of an actual room category

9. **Altering Room Categories in Order to Diminish/Dilute the Value of their Express and Implicit Warranties in the Points/Loyalty System**

9.1.   The points are not a commodity that is traded, in fact when the prices of rooms swing sporadically, the points needed to "purchase" that room remains the same.

9.2.   What this shows is that the inherent value of the room has not changed, and in fact cannot, in the space of a day.

9.3.   Essentially, incumbents are being punished/gouged at / taken advantage of unfairly and unjustifiably because of transient demand, and then subsides.

9.4.   By classification, these hotel rooms are time-shares, not tradable commodities and it is illegal to treat them as otherwise, otherwise they should be regulated by the SEC etc.

9.5.   Last year, when Ms Nwosu booked the Rome Cavalieri, a Waldorf Astoria hotel, there were not as many categories as there are now. The Rome Cavalieri hotel is an eight floor rectangular hotel with 2 primary views – the view overlooking the Roman city, and the view overlooking the street.

9.6.   ALL the rooms, with the exception of a few suites, have the same size and layout; it's a very basic hotel, in terms of architecture. Yet, from this layout, the Hilton is able to change the software to create multiple room categories, including a "private park view." This upsell in room categories is pure deception Rome Cavalieri has NO PRIVATE PARK! They even try to split the pool and park view into a category that one should pay for, whereas one can see both the pool and the park in one view – see figure 20.

9.7.   To Mr Nicholas' lies which Ms Nwosu exhaustingly refuted, there is no distinction in the floors, with the exception of the Imperial floor, i.e. the 8th floor– which too should not be something anyone has to pay extra for, because it has rooms of the same layout. It probably should just be assigned to people who book early for it and request it, not selling it as a different room category

9.8.   The Hilton has fewer properties globally with an executive lounge for Diamond member, for which they grew in popularity. For example in the Conrad, Ms Nwosu had to pay $300 extra to access the new "Sakura" lounge; the Cavalieri, similarly the Rome Cavalieri the Cavalieri lounge one has to pay extra.



*Figure 19 ridiculous hair splitting of room categories when in fact most the rooms are the same size and most have the same view*

*Figure 20 Photo of the "Rome View" taken in 2023 by Ms Nwosu - there is no private park, you can see the pool and the park from any balcony on this side of the hotel*

44



9.9.   At the Waldorf Astoria, DC, when they couldn't change the layout of the rooms, they behan changing the names of the rooms and demanding higher prices for a name change, without change to the substantive unit itself. For example, what previously was a grand room, is one a one bedroom suite, at double the price, which may be offered at a "deeply discounted" rate of half the price – i.e. the real price. This fraudulent pricing is in violation of both DC Consumer Protection and Virginia protection laws, and is fraudulent misrepresentation. See Exhibit 7.

9.10.  This restrictions on warranties by restricting the booking with points and randomly changing opportunities to avail of points booking is also wielded more sporadically by the 4th and 5th defendants, though not by creating frivolous room categories.

9.11.  The 5th defendant instead just restricts properties on which can book with points and the customers do not know which property, or when. It is completely random. This is an unfair practice because it lacks transparency yet influences the customer's decision to join their loyalty program. For example, had the Marriott advertised that their points can only be redeemed on **four out of their twenty plus brands**, Ms nwosu would not have signed up for their rewards. However, they keep their ads vague, intention is irrelevant. The material fact is she fully relied on the facts they mentioned in their program to have a reasonable expectation and inference that if they omitted to exclude that the points were not redeemable whenever she would like, or at a huge number of their brands, that would not be the case. Whereas the reverse is true.

45

.

9.12.   Additionally, the 5th defendant is totally incongruent in an untransparent manner with its offerings. For example, on one 7 day stay it will offer breakfast credit and count it as a long stay. Yet on another 7 day stay in the same hotel, this rate will not be available.

9.13.   This incongruency in its advertised value and sales offering that is based on sheer randomness only creates a loophole to extort guests, charge them unfairly as they please and empower their managers to have a fall-back excuse for earning more commissions. The question remains, what is the true value of the time share room, food and beverages you are offering guests.

9.14.   In fact defendant 6 and 8 weaponized the randomness and alleged obscurity of the pricing system to extort money from Ms Nwosu, withholding benefits that they know they ought to give based on historic practices, and her as a repeat corporate client.

9.14.1. For example both defendant 6 and 8 lied that they cannot offer discounts on long term rates, and defendant 6 went so far to bait & switch on Ms Nwosu after having her book a room, extend her stay on the pretense that he would apply a discount based on her extension. After she extended her stay, Roman boldly lied to Ms Nwosu stating it was out of his power, as a general manager, and had to go with what the system showed him

9.14.2. This is untrue as Ms Nwosu's with managers in the Ritz in Montreal, sua ponte offered Ms Nwosu a discount on her extended stay, and they book with the same system.

9.14.3. Similarly defendant 8 had lied to Ms Nwosu that there were discountable long term rates available, meanwhile Axel, his front desk staff had mentioned they had an in house guest who had booked an extended stay in one of the suites, and renewed it as needed. When Ms Nwosu asked for a similar option, defendant 8, steered her away discriminatorily towards the Rosewood Hotel, and said Axel had misspoken about the other long term guest that there was no such arrangement.

9.14.4. This price discrimination against Ms. Nwosu is unfair, as a self-employed business woman who repeatedly brings the suites business, she would be entitled to the same discounted rate as corporate clients, who do the same thing she does: repeatedly bring the hotels business through their stays. Somehow, these managers just saw Ms Nwosu as a cash-cow to exploit, similar to how women's self-care products like

shaving sticks became more expensive than men's in the famous adage: pink it and shrink it.

9.14.5. Notably, as the court upheld in 2020 in Fessler vs IBM in the Appellate Court for the 4th circuit, the lack of intention of the other party's obligation to fulfil a claim does not matter for the claimant, i.e. the expectation of the failed party to fulfill or not fulfill the obligation does not matter; what matters to successfully plead the claim is that the claimant had expectations, based on the actions of the defendant, that were eventually unmet . That the defendant reserved rights to modify their terms too is not a valid excuse to dismiss a claim of constructive and actual fraud; provided that up until the time of the actions, the claimant had a reasonable expectation based on their understanding of the terms as at the present moment. The defendant's rights to change terms does not preclude claims by a claimant in a breach of contract and fraud tort. Fessler v. IBM Corp., No. 18-2497 (4th Cir. 2020)

## 10. Counts of Anti Trust Violations – Sherman 1,2, Clayton Act and the Robinson Patman Act

10.1.   In **Brown Shoe Co. v. U.S., 370 U.S. 294 (1962),** the Supreme Court opined "it has long been clear that a pattern of acquisitions may itself create a combination illegal under § 1, especially when an original anticompetitive purpose is evident from the affiliated corporations' subsequent conduct. The Yellow Cab passage is most fairly read in light of this settled rule. In Yellow Cab, the affiliation of the defendants was irrelevant because the original acquisitions were themselves illegal. An affiliation "flowing from an illegal conspiracy" would not avert sanctions. Common ownership and control were irrelevant because restraint of trade was "the primary object of the combination." The Government brought suit to enjoin consummation of a merger of two corporations, on the ground that its effect might be sb- stantially to lessen competition or to tend to create a monopoly in the production, distribution and sale of shoes, in violation of § 7 of the Clayton Act, as amended in 1950. The District Court found that the merger would increase concentration in the shoe industry, both in manufacturing and retailing, eliminate one of the cor- porations as a substantial competitor in the retail field, and establish a manufacturer-retailer relationship which vould deprive all but the top firms in the industry of a fair opportunity to compete, and that, therefore, it probably would result in a further :ubstantial lessening of competition and an increased tendency toward monopoly.

In this case, the court stopped acquisitions and expansions by [enjoinig] the appellant from having or acquiring any further interest in the business, stock, or assets of the other corporation, required full divestiture by appellant of the other corporation's stock and assets, and ordered appellant to propose in the immediate future a plan for carrying into effect the Court's order of divestiture.

10.2. Likewise, the plaintiff in this case pleads that defendants 1 and 4 use their economic scales from acquisition to stifle competition and choices for consumers in the market. Specifically, their growth and pattern of acquisition strategies of luxury, upscale, midscale hotels, is such that it ends up dominating all three market tiers. Furthermore, this is problematic and lends to the violations of the Robinson Patman Act because of their use of artificial intelligence to dynamically raise prices across all hotel tiers simultaneously, at the same day and time, using a single computerized booking system. Since there are far more Marriotts and Hiltons than other boutique hotel chains in cities like downtown DC, once those sell out, customers are <u>forced</u> to comply with the artificially inflated prices of defendant 1 and 4 across all hotel lines.

10.2.1. This is a modern spin on the traditional price fixing, now using artificial intelligence, and it is illegal. An oral, written argument is not necessary between defendant 1 and 4, however since both can use their AI powered booking system to mirror the prices of each other based on demand, price fixing is inferred, and is sufficient for defendant 1 and 4 to violate The Sherman Act, via control of prices, whether intentional or not:

10.2.1.1. "The <u>Sherman   Act</u> §   1   condemns   any <u>contracts,</u>   combinations, and <u>conspiracies</u> in restraint of trade, which includes vertical and horizontal price-fixing schemes. Horizontal price fixing agreements are the stereotypical example of price fixing which involves competitors that agree to raise, lower or stabilize prices, creating a <u>cartel</u> agreement. For example, when two competing fast-food chains that sell hamburgers agree on the retail price of cheeseburgers, that horizontal agreement is illegal under the Sherman Act because it would undermine market pricing. Price fixing does not require an explicitly set price but can be achieved by agreeing on an algorithm or other method for controlling prices."

10.2.1.2. <u>Illegal price fixing can occur where the parties have not directly communicated with one another.</u> The Sherman Act § 1 covers "contracts," "combinations," or "conspiracies" formed in order to restrain trade which can occur without formal communication. For example in <u>*Interstate Circuit v. United States*</u>, the Supreme Court found a conspiracy to exist among the distributors of films in Texas, even though no evidence existed of communication among themselves, because each changed their prices after receiving the <u>same demands</u> from two primary movie theater companies in the state.

10.2.2. Defendants 1 and 4 use the same online booking system globally for their respective brands, it blurs the lines problematically between luxury and alleged midscale brands, whose tiers were traditionally separated by price.

10.2.2.1. For example an embassy suite can go for the same price as a Waldorf Astoria, for insufficiently justified reasons such as increased demand. This happened to the plaintiff on April 18th 2024 when there was high demand:

10.2.2.2. In the District of Columbia, the same room in the ritz went from $1300, to $3000, then $10,000 within the space of one night. On that same night the Embassy suites climbed up from $200 to $700+ and even when she enquired to stay in these rooms they ended up not being available. Meanwhile in periods of low demand, a room in the Waldorf Astoria DC sells for $400

10.3. Such unfair dynamic price changes and flattening among brand tiers misleads and confuses expectations of services among guests because the advertised services across brand tiers do not change at all on the websites – so for example it is unclear if housekeeping is once a week, three times a week or daily,

10.3.1. Additionally, in the airline industry business class is usually at least twice the price of the economy class, allowing for a clear distinction in value; and clearly business class has more amenities, exclusiveness, completely different comfort levels and service. Furthermore, when prices go up, they go up in a predictable pattern, usually trending up in ticket prices as the cheaper early bird tickets have been sold.

10.3.2. **Notably,** because flight tickets are not a commodity or security that can be traded or transferred, the prices once they go up, <u>typically do not go down, unlike the hotel industry</u>

10.3.3. The airline industry which is better regulated also offers customers transparent pricing such that it gives customers the option to to book airfares that are **not** subject to rebooking fees or fare differences should their plans have to change in the future.

Thus, customers can transparently hedge against sporadic rate hikes by paying more early on, to avoid change fees or fare differences should something happen and they need to amend their dates.

10.3.4. This is in contrast to an industry with the pricing of defendant 1 and 4 that involves sporadic upwards fluctuations in that blur the value distinction between lower tier hotels and luxury hotels, even though the amenities, value delivered are readily diminishing



Figure 21 example  price flattening across luxury and miscale brands caused by dynamic pricing used by 1st and 4th defendants – the hampton Inn, a midscale brand normally in the $100/$200 range can go for upwards of $360 and compete with the St. Regis, a luxury brand.

Figure 22 Within the Hilton the Conrad a luxury brand is only $77 dollars more than a Hampton Inn which is at least 8 tiers below the Conrad, according to the Hilton portfolio

**11. Gross Negligence, Willful and Wanton Negligence on the Part of Defendant 1 and Defendant 2**

11.1.   The plaintiff insists that defendant 1 has been grossly negligent in hiring incompetent staff who do not understand luxury consumerism and luxury to run luxury hotels. The closing of multiple luxury locations, aside from Ms Nwosu's personal experiences of substandard services is self-evident; including defendant 9 who came from a non-luxury hotel to a luxury hotel

11.2.   That grossly defendant 1 was negligent to re-hire defendant 2 and 3 to the Conrad Washington, DC, after the Conrad hotel had closed down in New York, Mid-Town, and they were part of the failure. That it was grossly negligent, if not wantonly negligent of defendant 1 to let the Conrad run without an operations manager or general manager, for any time period, while charging guests full, inflated and exorbitant rates.

11.3.   The plaintiff insists that defendant 1 is grossly and wantonly negligent to not establish an active and competent customer service desk, and that when Ms Nwosu called to escalate her complaints, the customer service desk did absolutely nothing, and that filing an official complaint on the website went back to the very hotel she was complaining about.

11.4.   The plaintiff avers defendant 1 was grossly negligent and wantonly negligent in receiving her feedback of poor housekeeping and safety services in their hotel, yet scaling down housekeeping services across their Hilton brands, without advertising and unbeknownst to guests

11.5.   The plaintiff avers defendant 1 is wantonly negligent to be receiving feedback from their consumers, managers and yet continue to recklessly expand, placing profits above people.

11.6.   The plaintiff avers defendant 1 is grossly and wantonly negligent to not ensure that their properties are pest and rodent free, and instead seek to pacify consumers by callously offering points for substandard hotel rooms, services and cleanliness standard

11.7.   The plaintiff avers defendant 1,4 and 5, are negligent in failing to ensure that their staff are well educated to treat all guests equitably irrespective of race.

11.7.1.   For example, during her stay at the Conrad Algarve in Portugal this May, Ms Nwosu encountered a hostile front desk staff, Natasha, who voiced her prejudice against

51

her for being a walk in and only first booking one night. Natasha called her the next day well before check out at noon, just to remind her to check out. Sadly for Natasha, Ms Nwosu elected to extend her stay for seven more days, having found at first blush, the hotel to be tolerable, and would be initially willing to spend her money.

11.7.2. Similarly, Ms Nwosu endured prejudice by the staff of Barcelona Hilton Diagonale, when Meche Aragonés profiled her as suspicious because she checked in at night. It's so stupid that the Hilton an international brand would not be cognizant of the local stereotypes by less educated Europeans who do not know that Black people can actually be wealthy, and *travel,* as they wish, and not have consciously sought to screen against such stereotypes, in their hiring.

11.8.   In all these claims the plaintiff has suffered harm, by way of monetary loss in paying for services she did not receive and/or was not as described, injured bodily as a result of stress, suffered losses from having to repeatedly move due to lapses in service quality and availability, stress in availing of benefits, repeatedly, book physiotherapy treatments from unwarranted stress.

## 12. Reliefs

Ms Nwosu cannot catch a break, whether trying to take a vacation or rent a room in a hotel for 6 weeks so she can focus on her work; these brands have made it practically impossible to plan, and to have a reasonable expectation for the service standards they advertise, especially for so called luxury. The incentivize and empower staff to effectively defraud and deprive guests of the explicit and implicit warranties they advertise, condone and become indifferent to poor standards, all the while ever increasing and ripping guests off. All defendants do this in instances of reckless disregard of prior settlements where they have been forced to pay out millions of dollars in claims to customers. Apparently, $5 million is not deterrent enough for illegal practices.

12.1.   Wherefore, for all the inconveniences suffered, monies lost, and breaches in service standards, the plaintiff seeks in excess of $600 million dollars in compensatory and punitive treble damages from the defendants ,

12.2.   She also seeks injunctive relief of $100,000.00 to recover her assets lost during the lapses of service standards, false advertisements, inter alia.

Respectfully Submitted,

Adaeze Nwosu

Plaintiff

22 July 2024

16 October 2024

Exhibit List

Exhibit 1 – 2nd booking confirmation, for Conrad Points redemption, early checkout for Conrad DC, silence by Conrad Team after failed services

Exhibit 2 – email showing duplicative debits on plaintiff's account meanwhile conrad invoice showing daily charges for pet and deposit were already taken

Exhibit 3 – Hilton police report Munich following theft of Ms Nwosu's gold jewelry

Exhibit 4 – T&C gold elie status

Exhibit 5 – See list of Marriott and Alexandria chains

Exhibit 6– Capital Hilton, Rodent infestation echange, no refund even on forfeited stays

Exhibit 7 – Lies that there are no discount at the Waldorf Astoria, and then violation of consumer protection laws marketing a room at double the price, whereas the true value is the reduced rate.

Certificate of Service

I certify that on the 22nd day of July 2024, I served all the defendants a copy of this complaint at:

1. Hilton WorldWide, Inc.
   1775 Tysons Blvd FL 7, McLean, VA, 22102 - 4285, USA
   Registered Agent:
   Corporation Service Company
   251 Little Falls Drive, Wilmington
   New Castle, DE, 19808
   *Defendant 1*

2. Chris Song
   950 New York Ave NW, Washington, DC 20001
   *Defendant 2*

3. Nancy Orlarei
   950 New York Ave NW, Washington, DC 20001
   *Defendant 3*

4. Marriott International, Inc.
   7750 Wisconsin Avenue,
   Bethesda, MD, 20814
   Registered Agent:
   The Corporation Trust Incorporated
   2405 York Road
   Suite 201
   Lutherville Timonium MD 21093-2264
   *Defendant 4*

5. The Ritz-Carlton Hotel Company, L.L.C.
   Registered Agent
   Corporation Trust Center 1209 Orange St, Wilmington, New Castle, DE 19801
   *Defendant 5*

6. Roman Dauze
   Tysons Corner,
   1700 Tysons Corner Blvd,
   *Defendant 6*

7. Emma Poplin
   3100 S St , NW, Washington, DC 20007
   *Defendant 7*

8. Rishi Malhotra
   3100 S St , NW, Washington, DC 20007
   *Defendant 8*

9. David Morrison
   1100 Pennsylvania Avenue NW, Washington, DC 20004

*Defendant 9*

Adaeze Nwosu, Plaintiff
1802 Vernon Street,
Washington DC 20009

*16 October 2024*

RECEIVED

2024 OCT 16  PM 3:23

U.S. DISTRICT COURT SDNY

EXHIBIT

for maving Jurisdiction out of the D.C. Metro Area.

RECEIVED

2024 OCT 16  PH 3: 23

U-S DISTRICT COURT SDNY

*Ms Adaeze Nwosu*

1802 Vernon Street
Washington, D.C.
20009, STE 508

Clerk of the Supreme Court
of the United States,
1 Street 1 First St NE,
Washington, DC 20543,
USA

15 October 2024

Dear Scott Harris,

### RE: Letter Dated 28 August 2024

Are the people running Yale University so arrogant as to think it can corruptly run the United States through usurpers like yourself? The plaintiff had long wondered why her certioraris had yet to be filed with the Supreme Court, and only last week found out that they had been corruptly intercepted by you, Scott Harris, one of Yale's 'hermes,' the greek god of thieves. If the plaintiff's claims are baseless, why is Yale pulling every corrupt puppeteering string to bury their transgressions which the plaintiff cites, before God and man?

With respect to your injudicious letter dated 28 August 2024, stating that there is no basis for an extraordinary writ of certiorari under the rules of the supreme court, you are re-directed to its very rules, upon which the plaintiff relied, Rule 20 "Procedure on a Petition for an Extraordinary Writ" on page 24, accessible from https://www.supremecourt.gov/filingandrules/2023RulesoftheCourt.pdf

With respect to your unsubstantiated deficiency notice, stating that there is no case summary, see the page 6 of the petitioner's for a writ of certiorari, wherein a summary is aptly described.

Similarly, with respect to your unsubstantiated deficiency notice, stating that there is no case summary, see the page 6 of the petitioner's for a writ of certiorari, wherein a summary is aptly described.

Ex-parte communications are prohibited, and in your capacity as clerk, you neither have legal authority to review the merits of a plaintiff's case, nor selectively highlight matters out of context, to serve your corrupt intentions.

Just in case you are otherwise cognitively disabled, I advise you declare your disability, lest you're criminally held responsible for racketeering, fraud, conspiracy to cover up and criminal color of law violations. Respectfully, it is my wish, for your sake, that you have exhausted your innumerous unconstitutional debaucheries.

You are hereby directed to file the plaintiff's writs of certiorari, including the extraordinary writ filed agains the state of Maryland, for which you callously issued a case number and then rescinded it, and for which the plaintiff complied with your fraudulent deterrent orders and resubmitted on September 27 2024.


With Calm Indignation,

Ms Nwosu

EXHIBIT

# Scott S. Harris



**20th Clerk of the Supreme Court of the United States**

**Incumbent**

**Assumed office**

September 1, 2013

| | |
|---|---|
| **Preceded by** | William K. Suter |

**Personal details**

| | |
|---|---|
| **Born** | Scott Sessions Harris<br>November 7, 1965 (age 58) |
| **Alma mater** | Yale University (BS)<br>University of Virginia (JD)[1] |
| **Signature** | *Scott S. Harris* |

# SUPREME COURT OF THE UNITED STATES
# OFFICE OF THE CLERK
# WASHINGTON, DC 20543-0001

August 28, 2024

Adaeze Nwosu
1802 Vernon Street
Ste. 508
Washington, DC 20009

    RE: Nwosu v. USA, et al.

Dear Mr. Nwosu:

    The above-entitled petition was postmarked and received August 23, 2024.  The papers are returned for the following reason(s):

    It is unclear how you wish to file. The Rules of this Court make no provision for filing a petition for an extraordianary writ of certiorari.

    Rule 20 addresses petitions for writs of mandamus, prohibition, mandamus and/or prohibition, and habeas corpus.

    If you wish to petition for review of the August 14, 2024 order, your petition should so specify.

    The petition fails to comply with the content requirements of Rule 14, in that the petition does not contain:

        A concise statement of the case.  Rule 14.1(g).

    The petition must contain the following, in the following order: the questions presented for review must be followed by the list of parties (if all do not appear on the cover), corporate disclosure statement (if applicable), table of contents, table of authorities, citations of the official and unofficial reports of opinions and orders entered in the case, statement of the basis for jurisdiction, constitutional provisions, treaties, etc., statement of the case, reasons for granting the writ, and the appendix. Rule 14.1.

Please correct and resubmit as soon as possible.  Unless the petition is submitted to this Office in corrected form within 60 days of the date of this letter, the petition will not be filed.  Rule 14.5.

A copy of the corrected petition must be served on opposing counsel.

The petition exceeds the limit of 40 pages allowed.  Rule 33.2(b).

When making the required corrections to a petition, no change to the substance of the petition may be made.

Sincerely,
Scott S. Harris, Clerk
By:

Redmond K. Barnes
(202) 479-3022

Enclosures

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## No. 24-5171

## September Term, 2023

### 1:24-cv-01852-CJN

### Filed On: August 14, 2024 [2070114]

In re: Adaeze Nwosu,

       Petitioner

## <u>O R D E R</u>

By order filed July 11, 2024, petitioner was directed to either pay the $600 appellate docketing or file a motion for leave to proceed on appeal in forma pauperis by August 12, 2024. To date, neither the required payment nor a motion has been filed by petitioner. Upon consideration of the foregoing, it is

**ORDERED** that this case be dismissed for lack of prosecution. <u>See</u> D.C. Cir. Rule 38.

No mandate shall issue.

                                      **FOR THE COURT:**
                                      Mark J. Langer, Clerk

                      BY:    /s/
                                        Scott H. Atchue
                                        Deputy Clerk

EXHIBIT

# RULES

### OF THE

# Supreme Court of the United States

---

**ADOPTED DECEMBER 5, 2022**

**EFFECTIVE JANUARY 1, 2023**

SUPREME COURT OF THE UNITED STATES

1 First Street, N. E.
Washington, DC   20543

Clerk of the Court ............................... (202) 479-3011
Reporter of Decisions........................... (202) 479-3390
Marshal of the Court........................... (202) 479-3333
Librarian............................................. (202) 479-3175
Telephone Operator ............................ (202) 479-3000

Visit the U.S. Supreme Court Website
http://www.supremecourt.gov

Mailing Address of the Solicitor General of the
    United States (see Rule 29.4)
Room 5616
Department of Justice
950 Pennsylvania Avenue, N. W.
Washington, DC   20530-0001

# TABLE OF CONTENTS

**PART I.   THE COURT**                                                                                   *Page*

Rule 1.   Clerk ................................................................................................   1
Rule 2.   Library ...............................................................................................   1
Rule 3.   Term ..................................................................................................   1
Rule 4.   Sessions and Quorum ...........................................................................   2

**PART II.   ATTORNEYS AND COUNSELORS**

Rule 5.   Admission to the Bar..............................................................................   2
Rule 6.   Argument *Pro Hac Vice* .......................................................................   3
Rule 7.   Prohibition Against Practice ...................................................................   4
Rule 8.   Disbarment and Disciplinary Action........................................................   4
Rule 9.   Appearance of Counsel...........................................................................   5

**PART III.   JURISDICTION ON WRIT OF CERTIORARI**

Rule 10.   Considerations Governing Review on Certiorari .....................................   5
Rule 11.   Certiorari to a United States Court of Appeals Before
              Judgment..............................................................................................   6
Rule 12.   Review on Certiorari: How Sought; Parties.............................................   6
Rule 13.   Review on Certiorari: Time for Petitioning .............................................   9
Rule 14.   Content of a Petition for a Writ of Certiorari .........................................   11
Rule 15.   Briefs in Opposition; Reply Briefs; Supplemental Briefs .....   14
Rule 16.   Disposition of a Petition for a Writ of Certiorari.....................................   17

**PART IV.   OTHER JURISDICTION**

Rule 17.   Procedure in an Original Action ...........................................................   17
Rule 18.   Appeal from a United States District Court.............................................   18
Rule 19.   Procedure on a Certified Question .........................................................   23
Rule 20.   Procedure on a Petition for an Extraordinary Writ ...............   24

**PART V.   MOTIONS AND APPLICATIONS**

Rule 21.   Motions to the Court.............................................................................   26
Rule 22.   Applications to Individual Justices.........................................................   27
Rule 23.   Stays ................................................................................................   28

**PART VI.   BRIEFS ON THE MERITS AND ORAL ARGUMENT**

Rule 24.   Briefs on the Merits: In General............................................................   29
Rule 25.   Briefs on the Merits: Number of Copies and Time to File ..   31
Rule 26.   Joint Appendix....................................................................................   32
Rule 27.   Calendar.............................................................................................   35
Rule 28.   Oral Argument ...................................................................................   36

I

below shall be filed within 45 days of the order requiring briefs or setting the case for argument.

### Rule 20.   Procedure on a Petition for an Extraordinary Writ

1. Issuance by the Court of an extraordinary writ authorized by 28 U. S. C. § 1651(a) is not a matter of right, but of discretion sparingly exercised.   To justify the granting of any such writ, the petition must show that the writ will be in aid of the Court's appellate jurisdiction, that exceptional circumstances warrant the exercise of the Court's discretionary powers, and that adequate relief cannot be obtained in any other form or from any other court.

2. A petition seeking a writ authorized by 28 U. S. C. § 1651(a), § 2241, or § 2254(a) shall be prepared in all respects as required by Rules 33 and 34.   The petition shall be captioned "*In re* [name of petitioner]" and shall follow, insofar as applicable, the form of a petition for a writ of certiorari prescribed by Rule 14.   All contentions in support of the petition shall be included in the petition.   The case will be placed on the docket when 40 copies of the petition are filed with the Clerk and the docket fee is paid, except that a petitioner proceeding *in forma pauperis* under Rule 39, including an inmate of an institution, shall file the number of copies required for a petition by such a person under Rule 12.2, together with a motion for leave to proceed *in forma pauperis*, a copy of which shall precede and be attached to each copy of the petition.   The petition shall be served as required by Rule 29 (subject to subparagraph 4(b) of this Rule).

3. (a) A petition seeking a writ of prohibition, a writ of mandamus, or both in the alternative shall state the name and office or function of every person against whom relief is sought and shall set out with particularity why the relief sought is not available in any other court.   A copy of the judgment with respect to which the writ is sought, including any related opinion, shall be appended to the petition together with any other document essential to understanding the petition.

No. _____

RECEIVED

2024 OCT 16  PM 3: 23

SUPREME COURT OF THE UNITED STATES

U.S DISTRICT COURT SDNY

Re: Adaeze Nwosu,
*Petitioner,*
vs.

1. Chief Judge Sri Srinivasan – U.S. Court of Appeals for the D.C. Circuit
2. Chief Judge James Boasberg – U.S District Court for D.C.
3. Judge Ana C. Reyes - U.S District Court for D.C.
4. Judge Dabney Friedrich - U.S District Court for the D.C.
5. Judge Christopher R. Cooper - U.S District Court for D.C.
6. Judge Carl Nichols - U.S District Court for D.C.
7. Judge Amy Jackson - U.S District Court for D.C.
8. Alison Grossman, Special Counsel to the Clerk, U.S. Court of Appeals for the D.C. Circuit
9. Scott Atchu, Operations Manager, Operations Manager, U.S. Court of Appeals for the D.C. Circuit
10. U.S Attorney – Jane Lyons
11. Kristen Clarke – Assistant Attorney General, Office of Civil Rights
12. Shaheena Simons – Chief in the Educational Opportunities Section of the Civil Rights Division at the Department of Justice.
13. The Department of Education, Office of Civil Rights

⎤ Office of the U.S.
⎦ Attorney

14. Judge Milton C Lee
15. Judge Yvonne Williams
16. Judge Carl C Ross

⎤ Attorney General for
⎦ D.C

17. Hewlett Packard Enterprise Co
18. American Express Company
19. Four Seasons LTD
20. The Archdiocese of Denver
21. Deutsche Bank Americas Holding Co.
22. Yale University
23. Executive Committee members of the Liasson Commission for Medical Education
24. University of Miami

⎤ Corporate/Institutional
⎦ Parties

25. Magdalit Bolduc, Archdiocese of Denver
26. Luc Vaillaint, Archdiocese of Denver
27. Jilian Siegelbaum, Office of Civil Rights, Department of Education
28. Meighan McCrea, Office of Civil Rights, Department of Education
29. Gilian Thompson, Office of Civil Rights, Department of Education
30. Barbara Barzansky, Liaison Committee for Medical Education

⎤ Individual Parties

1

31. Robert B. Hash, Liaison Committee for Medical Education
32. Kenneth B. Simons, Liaison Committee for Medical Education
33. Laura Ment, Yale University
34. Barbara Watts, Yale University
35. Richard S. Weisman

*Respondents.*

---

On Petition for a Writ of Certiorari to the United States Court of Appeals for the D.C. Circuit

**PETITION FOR AN EXTRAORDINARY WRIT OF CERTIORARI**

---

Adaeze Nwosu
Pro Se
1802 Vernon Street,
Washington, DC, 20009, Ste 508
ireoma@gmail.com
202-855-4226

"Whereas it appeareth that however certain forms of government are better calculated than others to protect individuals in the free exercise of their natural rights, and are at the same time themselves better guarded against degeneracy, yet experience hath shewn, that even under the best forms, **those entrusted with power have, in time, and by slow operations, perverted it into tyranny**; and it is believed that the most effectual means of preventing this would be, to illuminate, as far as practicable, the minds of the people at large, ....whence it becomes expedient for promoting the publick happiness that those persons, whom nature hath endowed with genius and virtue, should be rendered by liberal education worthy to receive, **and able to guard the sacred deposit of the rights and liberties of their fellow citizens, and that they should be called to that charge without regard to wealth, birth or accidental condition of circumstance.**"

— **Thomas Jefferson**, <u>Writings: Autobiography / Notes on the State of Virginia / Public and Private Papers / Addresses / Letters</u>

3

# I.    QUESTIONS PRESENTED

1. Can justice be delivered blindly if judges behave corruptly? Whereby corruptly means

    a. Intentionally withhold ruling on court processes to delay/deny justice

    b. Feign and apply judicial discretion to non-discretionary statutes to deprive plaintiffs of 14th amendment rights, and ultimately abuse power

    c. Lie about irrefutable facts of a case and common law to deny a party justice, for example lying about the existence of a civil division for domestic abuse, or determining jurisdiction of a defendant based on the residence of a plaintiff, rather than a defendant

    d. Fail to recuse themselves even when they are party to a suit brought to by a plaintiff based on statutory violations in which they had no discretion

2. Whether a case can be deemed properly removed to federal court, and state proceedings suspended, if the judicial officer intentionally continues proceedings, without first deciding the motions to remand and oppositions thereof; and if such motions can be decided by a judge whose objectivity is reasonably questioned

4

3.  Whether a judge who deems cases concerning statutory breaches of plaintiff's rights by fellow judges as frivolous, can objectively preside over such plaintiff's suits?

4.  Whether judges have qualified immunity when they act in the absence of all jurisdiction to violate statutory rights guaranteed by the constitution rights, recklessly and/or maliciously?

5.  Whether a plaintiff can avail of due process constitutional rights when the appellate court within that circuit blocks plaintiff's being granted due process and having a case heard on its merits through mischief and retaliation, and whether such acts are constitutional?

    a.  For example , whether it is not treasonous and unconstitutional of clerks in the D.C circuit to repeatedly intentionally misfiling an appellant's brief as a response to the appellee's motion for summary affirmance, so it may be dismissed and then when remanded, outrightly dismisses the appellants on the same day in retaliation?

## II.    TABLE OF CONTENTS

I.   QUESTIONS PRESENTED ...................................................................... 4

II.  TABLE OF CONTENTS ....................................................................... 6

III. JURISDICTION .................................................................................. 7

IV.  SIGNIFICANCE TO LOCAL AND GOBAL PUBLIC POLICY .................. 8

V.   LIST OF PARTIES ............................................................................ 15

VI.  CONSTITUTIONAL AND STATUTORY PROVISIONS EXPLICITLY AND
IMPLICITYLY RELIED UPON IN THE PLAINTIF'S CERTIORARI ................ 16

VII. AN ALLEGORICAL REPRESENTATION OF THE CASES .................... 26

VIII. SUMMARY OF THE PLAINTIFF'S CASES AND JUDICIAL INFRINGEMENT OF
FUNDAMENTAL FREEDOMS ................................................................ 34

The plaintiff's cases transgress the fundamental freedoms guaranteed by the U.S. Constititution and actually help improve lives nationally and internationally: the right to practice religious freedoms, the right to life, the right to property, through wealth generation and preservation. The plaintiff/appellant, who has boldy not put up with the guiles of judges seeking to protect the status quo even when it violates the constitution, has been blackwalled from appealing her cases in the D.C. court of appeals as the courts have evidently conspired to mis-docket and dismiss her cases illicitly. The District of Columbia judicial system evidently runs like a club, wherein ex-parte communications among judges and counsels are rife, and law is oppressively wielded against non-conforming parties, and the consittuional provisions and statutes are relegated to the erratic rules of unfaithful judges to the U.S. Constitution. The plaintiff files this extraordinary writ as she is unable to exercise her right of appeal, without mischief, and thus has to invoke this court's supervisory power to safeguard the constitutional protections afforded persons subject to the U.S. jurisdiction thereof.

IX.  WHY THIS WRIT SHOULD BE GRANTED ......................................... 45

X.   CONCLUSION ................................................................................ 46

XI.  LIST OF RELATED CASES AND STATUS OF THE CASES ................. 48

XII. APPENDIX A - ORDERS ................................................................. 50

XIII. APPENDIX B – PLAINTIFF'S APPEALS ........................................... 51

### III.   JURISDICTION

John Steinbeck, author of mice and men once stated *"Power does not corrupt. Fear corrupts... perhaps the fear of a loss of power."* The appellant files this extraordinary writ of certiorari to the supreme court, having hit the walls of corruption within the district and appellate courts of the District of Columbia, wielded by staff and judges alike, to prevent *any* of the plaintiff's cases progressing. Notably, all of the plaintiff's cases touch on the most fundamental freedoms for anyone subject to the US jurisdiction thereof, including a right to property/wealth, freedom to generate legitimate wealth, a right to practice religion, and a right to live. Contrary to the statutes and guarantees of the United States Constitution, the judges, federal government agencies and its employees listed have a different opinion and instead abuse their powers to mis-apply the constitution in a manner that treasonous, as they fraudulently pretend to deliver justice blindly. In reality, these judicial employees have formed a club/cartel to protect the interests of financial instructions, educational institutions with large endowments, themselves and their colleagues, all the while ruling in an oppressive manner that promotes the degeneration and enslavement of those who are already marginalized in society and/or they do not agree with, and not exclusive of non-white "non-conformists." These judges wield this dictatorial/autocratic agendas through by nonsensical interpretations of law, so that common sense and the law are jettisoned; outright denial of statutory provisions, and cover ups among the judges themselves to bury their constitutional transgressions and abuses of judicial power.

Having exhausted administrative remedies, and rather than waiting through an evidently corrupted appeals process, the plaintiff thus files this writ as a recourse to invoke the SCOTUS' supervisory role.

This writ is authorized by 28 U. S. C. § 1651(a). The supreme court's authority is expressly confirmed in the All Writs Act, 28 U. S. C. § 1651. This statute has served since its inclusion, in substance, in the original Judiciary Act as a "legislatively approved source of procedural instruments designed to achieve `the rational ends of law.' " Price v. Johnston, 334 U. S. 266, 282 (1948), quoting Adams v. United States ex rel. McCann, 317 U. S. 269, 273 (1942). It has been established that the courts may rely upon this statute in issuing orders appropriate to assist them in conducting factual inquiries. American Lithographic Co. v. Werckmeister, 221 U. S. 603, 609 (1911)

## IV.    SIGNIFICANCE TO LOCAL AND GOBAL PUBLIC POLICY

The extraordinary writ is important to public policy and timely because the plaintiff's complaints touch finance, education, religion, business (wealth generation) and property rights (wherein financial institutions like Deutsche Bank are holding onto financial assets, and being unjustly enriched, even though court orders in other jurisdictions have demanded its release of the plaintiff's assets). These institutions, including the institutions of stealthy white supremacy, tarry behind the veil of corrupt judicial practices, wherein the judges don't practice blind justice or remember their oath to the 14th amendment  to treat everyone equitably before the law and instead inequitably tilt the scales of justice away from the people to wield power in a manner that is not just morally depraved, but

shocking to the conscience and unconstitutional, and against the spirit of American democratic values.

For example in Nwosu vs. American Express Company ("AmEx") et.al, Ms Nwosu brought a complaint against large a financial institutions whose rewards programs subtly alter consumer spending behaviors and psychologies, and place millions of Americans in debt, all the while making promises they have no intention or ability to keep, thus breaching their contracts and obligations to the consumers. Additionally, Ms Nwosu found that Amex had specifically created a consumer product that had no regulation; it was not a credit card, but a charge card, meaning though it advertised as a credit card, it was operating within a regulatory abyss to offer programs it could not enforce or guarantee, and eventually breaching its contracts to consumers while leaving card fraud unchecked and unjustly shifting liability to consumers. Unfortunately, these large financial institutions and institutions with large endowments such as Yale corrupt judges to protect their interests, instead of the interests of the public. In this American Express case, the plaintiff was twice denied her due process rights, of granting her time to oppose a transfer of her case from the state court to the federal District Court, in an attempt to compel arbitration and/to use more lenient contract federal laws. The breaches occurred twice, under the auspices of Judge Carl E. Ross from D.C. Superior Court and Ana C. Reyes and Amy Jackson from the D.C. district court. In this case against Amex in the Superior court of D.C in February, 2024, the defendants filed a notice to move the case to federal court sometime in March 2024. The problem was, federal judge Ana Reyes, to whom the case was assigned, had been sued by the plaintiff for covering up the statutory breaches of her colleague Dabney, and failed to recuse herself, though her

objectivity to preside on the plaintiff's case and even abide by her oath to the US constitution was evidently in question, and thus necessitating a recusal otherwise a failure to recuse on such significant grounds would invalidate her orders. Ana failed to recuse citing the plaintiff's complaint of her colleague and her apparent transgressions of the constitution as "frivolous." Recusals aside, Furthermore, Ana did not have the authority to preside over the case because she never decided if the removal was proper until four months later, meanwhile she had been dolling out necessarily invalid orders prior. On April 17, 2024, the plaintiff had filed a motion to remand, citing the exception in 28 U.S. Code § 1441 (c)(1)(B), wherein the state had exclusive jurisdiction because the entire complaint was predicated on state law, which the plaintiff <u>chose</u>, and had a right to choose, as the party bringing the suit, and the plaintiff would be prejudiced by a change to federal law. Thus, without first deciding the plaintiff's motion to remand, and whether the transfer was proper the state *technically,* still had jurisdiction over the case. See *Allstate Ins. Co. v. Superior Court, 132 Cal. App. 3d 670, 675-76, 183 Cal. Rptr. 330, 333 (1982), Dauenhauer v. Superior Court, 149 Cal. App. 2d 22, 24, 307 P.2d 724, 726 (1957); State v. Lehman, 203 Neb. 341, 278 N.W.2d 610, 615 (1979). "The state court's jurisdiction will come to an end under either of two sets of circumstances. In the first instance, the state court loses jurisdiction if the federal court obtains jurisdiction as a result of a proper removal. Id. at 676, 183 Cal. Rptr. at 333; see supra notes 1-3 and accompanying text. Alternatively, the state court loses jurisdiction if the federal court determines that the state court never had jurisdiction over the lawsuit."* In the plaintiff's case, neither of these things happened: Ana, made no mention of remanding the suit, or deciding to adopt state law in federal court, so as to not prejudice the plaintiff. Rather, she jettisoned the

entire rules of federal civil procedure, and rather incompetently, became a dictator riding on <u>her own</u> set of rules. The plaintiff also brought suit against Carl Ross, the D.C judge, because until the transfer of the forum is deemed proper, he *ought* to have known, that he had not lost jurisdiction, and that the plaintiff's pending motions of default against the defendant and motion to reconsider issuing a notice of transfer in March, were <u>valid.</u> Unfortunately, Ana's conduct is the most morally depraved of all the judges Ms Nwosu has come across, perhaps because of her upbringing during a Uruguayan dictatorial regime; in this case, she did not rule on the plaintiff's motion to remand the case for 4 months because evidently she already was prejudiced against the plaintiff and desired to oppress the plaintiff under the color of law and her own constitution.

The plaintiff notes that the meddling of financial institutions to corrupt judges is nothing new, and allegedly occurs in the Supreme Court itself with representatives moving for impeachment proceedings of judges Alito and Clarence who receive kickbacks from such powerful institutions to sway public policy in their favor and who would necessarily have to recuse themselves from these cases[1]. Similarly, in Nwosu vs Yale et al. Yale University was found to be operating the very phone lines of the Department of Education's Office of Civil Rights, where the plaintiff was leaving her voicemail complaints of civil rights violations against Yale University. Ms Nwosu brought the obstruction of justice to the notice of the department of justice, specifically to Ms Kristen Clarke and Ms Shaheena Simons, a Yale graduate in February 2023, and although the Department of Education's voicemail was promptly changed to remove mentions of Yale, following the

---

[1] <u>Rep. AOC Delivers Major Floor Speech on Articles of Impeachment Against Justices Thomas and Alito</u> s

plaintiff's complaint, Ms Nwosu's case against Yale university in the Department of Education, remained shelved indefinitely. This fraud, racketeering and conspiracies with governmental employees are akin to the Watergate Scandal that led to the impeachment of Nixon upon discovery. Yet the judicial system has become so brazenly corrupt that the judges themselves protect the transgressions of these institutions.

In all her cases, the plaintiff, a "black" woman, by America's standards of racial classification, has audaciously challenged predominantly white institutional bullies, which is shocking to both black and white judges alike, because in part though America has made strides to recognize black people as fully human, in reality, the former white slave owners turned pro-segregationists, have not really come that far in overhauling their slave mentality  so in the darkest recesses of their hearts, there is an unwavering belief, however slight, that white people are superior to blacks. In the most unsuspecting moments of daily life, the plaintiff has borne witness to such sentiments that black people should have "left-overs," and that black people should be "grateful" for the considerate remnants given by whites. On one occasion while shopping, the young white store attendant, declined offering directions to another white male, stating he couldn't assist because *he did not know anything* as he was just "the help." Similarly, vice president nominee and Yale graduate, senator J.D. Vance echoed undertones of entrenched white privilege and superiority, when he said he did not think Kamala Harris is "grateful" for the history of America[2]. Accordingly, some black people have *adjusted* to operating within the "5 mile radius" gratuitously afforded them by

---

[2] Senator J.D Vance stating Vice President Kamala Harris should be grateful for America's [slave] history

whites, wherein justices thus like, Carl E. Ross, Yvonne Williams, Milton E Lee, intentionally answer "white" names to become palatable chameleons to their former slave owners, and not only turn a blind eye of indifference to transgressions against their ethnicity, but act as guards turning facts and common law doctrines on their head, to protect the interest of their white masters, even though they have the power to administer justice racially blind justice as is expected.   Thus, although they slam the gavel to issue orders, their hands remain invisibly bound in chains, and their remain tails between their legs beneath the black veil of their judicial robes, covering a multitude of suppressed emotions such as fear of falling out of favor and ultimately drowning any inclinations to uphold the truth. In fact Judge Yvonne Williams spent her career as a black lawyer earning a living by protecting the status quo of discrimination; i.e. receiving paychecks for being a black guard against her own ethnicity, blocking discrimination cases brought by aggrieved employees against their institutions.   Yet she unashamedly played the race card and remembered she was "black," when it was time to diversify the judiciary, and ultimately became former president Obama's nominee in 2011. In the plaintiff's case over which she presided, she lied to cover up abuse, by skewing the facts of the case to such a degree  so as to find illicit cause to dismiss the plaintiff's complaint: she lied that a whole civil division of the superior court of D.C dedicated to domestic abuse was non-existent, and so domestic abuse could only be prosecuted criminally, and so the plaintiff failed to state a claim upon which a relief could be brought; she dismissed then promptly closed the case. Such transgressions of law by judicial officials are incredibly shocking to the conscience. *Koessel v. Sublette Cnty. Sheriff's Dep't, 717 F.3d 736 (10th Cir. 2013) and County of Sacramento v. Lewis, 523 U.S. 833, 118 S. Ct. 1708 (1998).*

The plaintiff's case also involves transgressions by Yale graduates who occupy influential positions within the judiciary of the District of Columbia and the U.S have evidently played a role in stopping the plaintiff's complaints from progressing[3]. The plaintiff thus files this writ following the morally depraved and unconstitutional manner in which justices in the District of Columbia adjudicate with impunity and invincibility. Extraordinary writs may be filed at any time and have no time limits, unlike standard writs of certiorari.



*God who gave us life gave us liberty. Can the liberties of a nation be secure when we have removed a conviction that these liberties are the gift of God?*

*Indeed I tremble for my country when I reflect that god is just, that his justice cannot sleep for-ever. Commerce between master and slave is despotism. Nothing is more certainly written in the*

*Book of fate than that these people are to be free. Establish the law for educating the common people. This it is the business of the state to effect and on a general plan.*

- *Thomas Jefferson*

*Figure 1 Image caption of words by Thomas Jefferson, one of the nation's founding father's from his memorial in the nation's capital*

---

[3] The Chief Judge of the US District Court is a Yale graduate, the university against which the plaintiff has brought a complaint; Judge Dabney is a Yale graduate, Shaheena Simons; more are in the appellate D.C court. In the Supreme Court, Brett Kavanaugh is a Yale graduate and the plaintiff remembers him being broken on T.V because of allegations of sexual misconduct, and then eventually being sworn in.

## V.    LIST OF PARTIES

*The United States of America*

1.  Chief Judge Sri Srinivasan – U.S. Court of Appeals for the D.C. Circuit

2.  Chief Judge James Boasberg – U.S District Court for D.C.

3.  Judge Ana C. Reyes - U.S District Court for D.C.

4.  Judge Dabney Friedrich - U.S District Court for the D.C.

5.  Judge Christopher R. Cooper - U.S District Court for D.C.

6.  Judge Carl Nichols - U.S District Court for D.C.

7.  Judge Amy Jackson - U.S District Court for D.C.

8.  Alison Grossman, Special Counsel to the Clerk, U.S. Court of Appeals for the D.C. Circuit

9.  Scott Atchu, Operations Manager, Operations Manager, U.S. Court of Appeals for the D.C. Circuit

10. U.S Attorney – Jane Lyons

11. Kristen Clarke – Assistant Attorney General, Office of Civil Rights at the Department of Justice

12. Shaheena Simons – Chief in the Educational Opportunities Section of the Civil Rights Division at the Department of Justice.

13. The Department of Education, Office of Civil Rights

*Attorney General for the District of Columbia*

1.  Judge Milton C Lee

2.  Judge Yvonne Williams

3.  Judge Carl C Ross

*Corporate / Institutional Parties*

15

1. Hewlett Packard Enterprise Co

2. American Express Company

3. Four Seasons LTD

4. The Archdiocese of Denver

5. Deutsche Bank Americas Holding Co.

6. Yale University

7. Executive Committee members of the Liasson Commission for Medical Education

8. University of Miami

*Individual Parties*

1. Magdalit Bolduc, Archdiocese of Denver

2. Luc Vaillaint, Archdiocese of Denver

3. Jilian Siegelbaum, Office of Civil Rights, Department of Education

4. Meighan McCrea, Office of Civil Rights, Department of Education

5. Gilian Thompson, Office of Civil Rights, Department of Education

6. Barbara Barzansky, Liaison Committee for Medical Education

7. Robert B. Hash, Liaison Committee for Medical Education

8. Kenneth B. Simons, Liaison Committee for Medical Education

9. Laura Ment, Yale University

10. Barbara Watts, Yale University

11. Richard S. Weisman

## VI.   CONSTITUTIONAL AND STATUTORY PROVISIONS EXPLICITLY AND IMPLICITYLY RELIED UPON IN THE PLAINTIF'S CERTIORARI

*Constitutional Provisions*

1. United States Constitution, Amendment XIV:

   All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; **nor deny to any person within its jurisdiction the equal protection of the laws.**

   b. United States Constitution, Amendment XIV Section 5

   The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

2. The Supremacy Clause in Article VI, Clause 2:

   This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, **shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.**

3. The Supremacy Clause in Article VI, Clause 3:

   The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive **and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution**; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

4. United States Constitution, Amendment V

   No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service

in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, **nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without *just compensation*. Procedural due process often requires the government to provide a person with notice and an opportunity for a hearing before such a deprivation**[4]

In addition, the Supreme Court has interpreted the Fifth Amendment's Due Process Clause to include substantive due process guarantees that protect certain fundamental constitutional rights from federal government interference, regardless of the procedures that the government follows when enforcing the law[5].

5. United States Constitution, Amendment XIII

Neither slavery nor **involuntary servitude**, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

6. Civil Rights Act of 1866

The Civil Rights Act of 1866 mandated that "all persons born in the United States," with the exception of American Indians, would be declared as "citizens of the United States." **The Act then guaranteed that all "citizens, of every race and color . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real**

---

[4] 4. Twining v. New Jersey, 211 U.S. 78, 110 (1908); Jacob v. Roberts, 223 U.S. 261, 265 (1912)

[5] Zablocki v. Redhail, 434 U.S. 374, 386–87 (1978), citing Loving v. Virginia, 388 U. S. 1 (1967)

**and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property.**"

*Statutes*

7. <u>Title VI Civil Rights Act of 1964</u>

Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs or activities that receive federal financial assistance.

8. <u>42 U.S. Code § 1983 - Civil action for deprivation of rights</u>

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's <u>judicial capacity</u>, wherein torts involving gross/reckless negligence and/or malice, are <u>not</u> considered within the scope of judicial capacity. A judge may be held civilly liable when acting in "clear absence of all jurisdiction" see *Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351 (1872).*

***Ordinances & Regulations***

9. <u>Incorporation Doctrine/ Bill of Rights under Amendment XIV</u>

Modern Supreme Court doctrine embraces the doctrine of selective incorporation of the Bill of Rights against the states, meaning that the Court has held on a case-by-case basis that many of the provisions of the Bill of Rights limit state government action. Numerous Supreme Court decisions hold that particular provisions of the Bill of Rights have been applied to the states through the Fourteenth Amendment's Due Process

19

Clause. Primarily through the doctrine of selective incorporation, the Court has held that most provisions of the Bill of Rights apply to the state constitutional provisions, treaties, statutes, ordinances & regulations involved in the case.

### *Case Law/ Legal Precedent explicitly and implicitly referenced for claim standing*

10. *Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351 (1872).*

   - A judge may be held civilly liable when acting in "absence of all jurisdiction"

11. *Harlow v. Fitzgerald, 457 U.S. 800 (1982)*

   - Federal officials seeking absolute immunity from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope. Pp. 457 U. S. 806-808.

   - Under the "functional" approach to immunity law, immunity protection extends no further than its justification warrants. Pp. 457 U. S. 809-811.

   - (b) While absolute immunity might be justified for aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, a "special functions" rationale does not warrant a blanket recognition of absolute immunity for all [government officials] in the performance of all their duties. To establish entitlement to absolute immunity, a [governmental official] first must show that the responsibilities of his office

embraced a function so sensitive as to require a total shield from liability. He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted.

12. *Jacob v. Roberts, 223 U.S. 261, 265 (1912)*

13. See *Allstate Ins. Co. v. Superior Court (1982)*

14. *State v. Lehman (1979)*

15. *Dauenhauer v. Superior Court (1957)*

- Part of due process under the XIV amendment is notice. Judge Carl Ross failed to reconsider his decision to transfer the plaintiff's suit against American Express to the Federal District because he made the decision without first allowing the plaintiff to submit her opposition, and even after receiving such opposition failed to reconsider the matter, and although the case was not properly removed to federal court and the jurisdidction thereof, of the district court was illegitimate

16. *Korematsu v. United States (1944)*

- It should be noted, to begin with, that all legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny.

- Justice Murphy noted "this exclusion of 'all persons of Japanese ancestry' . . . goes over 'the very brink of constitutional power,' and

falls into the ugly abyss of racism." Justice Murphy concluded that the exclusion of Japanese-Americans "deprive[d] all those within its scope of the equal protection of the laws as guaranteed by the Fifth Amendment."

- Barnett, Randy E.; Blackman, Josh. An Introduction to Constitutional Law: 100 Supreme Court Cases Everyone Should Know (p. 102). Aspen Publishing. Kindle Edition.

17. *In Trump v. Hawaii (2018),*

- Chief Justice Roberts wrote that "Korematsu was gravely wrong the day it was decided, has been overruled in the court of history, and— to be clear— has no place in law under the Constitution."

18. *Braatelien v. United States, 147 F.2d 888 (8th Cir. 1945).*

- On Waivers of Judicial Immunity on a Federal level: [Judges] may be held criminally and/or [civilly] responsible when [they] acts fraudulently or corruptly. Judicial title does not render its holder immune to crime and/or [civil remedies] even when committed behind the shield of judicial office.

19. *Koessel v. Sublette Cnty. Sheriff's Dep't,* 717 F.3d 736 (10th Cir. 2013) and *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S. Ct. 1708 (1998)

- What differentiates a constitutional transgression from an ordinary common law tort is a "level of executive abuse of power . . . that . . . shocks the conscience." Id. at 846, 118 S.Ct. 1708. In other words, the executive abuse represents "arbitrary action of government" and requires a showing of government officials

22

**"abusing their power, or employing it as an instrument of oppression.**" Id. at 845-46, <u>118 S.Ct. 1708</u> (quotations and brackets omitted).

20. *Seegmiller v. Laverkin City*, 528 F.3d 762 (10th Cir. 2008)

- The Due Process Clause of the Fourteenth Amendment protects individuals against state action that either `shocks the conscience,' or interferes with [fundamental] rights `implicit in the concept of ordered liberty'

21. *Hogan v. City of El Dorado*, 455 F. Supp. 2d 876, 884 (W.D. Ark. 2006)

- The Fourteenth Amendment guarantees "[s]ubstantive due process [, which] prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." Moran v. Clarke,296 F.3d 638, 643 (8th Cir. 2002) (alterations in original) ( quoting Weiler v. Purkett,137 F.3d 1047, 1051 (8th Cir. 1998) (en bac)). To establish a substantive due process claim, Hogan must prove that "a government action was `sufficiently outrageous' or `truly irrational, that is, something more than . . . arbitrary, capricious, or in violation of state law.'" Young v. City of St. Charles,244 F.3d 623, 628

22. *Jones v. City of Chicago*, <u>856 F.2d 985, 992</u> (7th Cir. 1988)).

- A supervisor can only incur liability for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes

deliberate indifference toward the violation. *Choate v. Lockhart,* 7 F.3d 805, 809 (8th Cir. 1994)

23. *Sanchez v. City of Fresno, 914 F. Supp. 2d 1079, 1099 (E.D. Cal. 2012)*

- The Fourteenth Amendment bars "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment encompasses two types of protections: substantive rights (substantive due process) and procedural fairness (procedural due process). See Zinermon v. Burch,494 U.S. 113, 125–28, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

- Courts are instructed to resist the temptation to augment the substantive reach of the Fourteenth Amendment, "particularly if it requires redefining the category of rights deemed to be fundamental." *Bowers v. Hardwick,*478 U.S. 186, 195 (1986), overruled on other grounds, *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

24. *Collins v. Harker Heights,* 503 U.S. 115, 112 S. Ct. 1061 (1992)

- The substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." Collins v. City of Harker Heights, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

25. *Friends of Roeding Park v. City of Fresno*, 848 F. Supp. 2d 1152 (E.D. Cal. 2012)

- To state a substantive due process claim, plaintiff must allege "a state actor deprived [him] of a constitutionally protected life, liberty, or property interest."

- To put it another way, the concept of substantive due process, "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty' " Nunez v. City of Los Angeles, 147 F.3d 867, 871 (9th Cir.1998) (quoting Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952))

- To state a claim for violation of procedural due process, plaintiff must allege: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections. *Kildare v. Saenz,* 325 F.3d 1078, 1085 (9th Cir.2003).

## VII.   AN ALLEGORICAL REPRESENTATION OF THE CASES

Many years ago there was an Emperor so exceedingly fond of new clothes that he spent all his money on being well dressed. He cared nothing about reviewing his soldiers, going to the theatre, or going for a ride in his carriage, except to show off his new clothes. In the great city where he lived, life was always gay. Every day many strangers came to town, and among them one day came two swindlers. They let it be known they were weavers, and they said they could weave the most magnificent fabrics imaginable. Not only were their colors and patterns uncommonly fine, **but clothes made of this cloth had a wonderful way of becoming invisible to anyone who was unfit for his office, or who was unusually stupid.** "Those would be just the clothes for me," thought the Emperor. "If I wore them I would be able to discover which men in my empire are unfit for their posts. And I could tell the wise men from the fools. Yes, I certainly must get some of the stuff woven for me right away." He paid the two swindlers a large sum of money to start work at once.

The weavers set up two looms and pretended to weave, though there was nothing on the looms. All the finest silk and the purest old thread which they demanded went into their traveling bags, while they worked the empty looms far into the night. "I'd like to know how those weavers are getting on with the cloth," the Emperor thought, but he felt slightly uncomfortable when he remembered that those who were unfit for their position would not be able to see the fabric. **It couldn't have been that he doubted himself [as stupid or unfit for office], yet he thought he'd rather send someone else to see how things were**

26

**going.** The whole town knew about the cloth's peculiar power, and all were impatient to find out how stupid their neighbors were. "**I'll send my honest old minister to the weavers,**" the Emperor decided. "He'll be the best one to tell me how the material looks, **for he's a sensible man and no one does his duty better.**" So the honest old minister went to the room where the two swindlers sat working away at their empty looms. "Heaven help me," he thought as his eyes flew wide open, "I can't see anything at all". But he did not say so. Both the swindlers begged him to be so kind as to come near to approve the excellent pattern, the beautiful colors. They pointed to the empty looms, and the poor old minister stared as hard as he dared. He couldn't see anything, because there was nothing to see. "Heaven have mercy," he thought. "**Can it be that I'm a fool? I'd have never guessed it, and not a soul must know. Am I unfit to be the minister? It would never do to let on that I can't see the cloth.**"

"Don't hesitate to tell us what you think of it," said one of the weavers.

"Oh, it's beautiful-it's enchanting." The old minister peered through his spectacles. "Such a pattern, what colors!" I'll be sure to tell the Emperor how delighted I am with it."

The Emperor presently sent another trustworthy official to see how the work progressed and how soon it would be ready. The same thing happened to him that had happened to the minister. He looked and he looked, but as there was nothing to see in the looms he couldn't see anything. "Isn't it a beautiful piece of goods?" the swindlers asked him, as they displayed and described their imaginary pattern. "I know I'm not stupid," the man thought, "so it must be that I'm unworthy of my good office. That's strange. I mustn't let anyone find it out,

27

though." So he praised the material he did not see. He declared he was delighted with the beautiful colors and the exquisite pattern. To the Emperor he said, "It held me spellbound."

All the town was talking of this splendid cloth, and the Emperor wanted to see it for himself while it was still in the looms. Attended by a band of chosen men, among whom were his two old trusted officials-the ones who had been to the weavers-he set out to see the two swindlers. He found them weaving with might and main, but without a thread in their looms."Magnificent," said the two officials already duped. "Just look, Your Majesty, what colors! What a design!" They pointed to the empty looms, each supposing that the others could see the stuff.

"What's this?" thought the Emperor. "I can't see anything. This is terrible! Am I a fool? **Am I unfit to be the Emperor? What a thing to happen to me of all people! — Oh! It's *very* pretty," he said**. "It has my highest approval." And he nodded approbation at the empty loom. Nothing could make him say that he couldn't see anything.

His whole retinue stared and stared. One saw no more than another, **but** they all joined the Emperor in exclaiming, "Oh! It's very pretty," and **they advised him to wear clothes made of this wonderful cloth** especially for the great procession he was soon to lead. "Magnificent! Excellent! Unsurpassed!" were bandied from mouth to mouth, and everyone did his best to seem well pleased. The Emperor gave each of the swindlers a cross to wear in his buttonhole, and the title of "Sir Weaver."

Before the procession the swindlers sat up all night and burned more than six candles, to show how busy they were finishing the Emperor's new clothes. They

pretended to take the cloth off the loom. They made cuts in the air with huge scissors. And at last they said, "Now the Emperor's new clothes are ready for him." Then the Emperor himself came with his noblest noblemen, and the swindlers each raised an arm as if they were holding something. They said, "These are the trousers, here's the coat, and this is the mantle," naming each garment. "All of them are as light as a spider web. One would almost think he had nothing on, but that's what makes them so fine."

"Exactly," all the noblemen agreed, though they could see nothing, for there was nothing to see.

"If Your Imperial Majesty will condescend to take your clothes off," said the swindlers, "we will help you on with your new ones here in front of the long mirror."The Emperor undressed, and the swindlers pretended to put his new clothes on him, one garment after another. They took him around the waist and seemed to be fastening something — that was his train-as the Emperor turned round and round before the looking glass."How well Your Majesty's new clothes look. Aren't they becoming!" He heard on all sides, "That pattern, so perfect! Those colors, so suitable! It is a magnificent outfit." Then the minister of public processions announced: "Your Majesty's canopy is waiting outside." "Well, I'm supposed to be ready," the Emperor said, and turned again for one last look in the mirror. "It is a remarkable fit, isn't it?" He seemed to regard his costume with the greatest interest.

The noblemen who were to carry his train stooped low and reached for the floor as if they were picking up his mantle. Then they pretended to lift and hold it high. They didn't dare admit they had nothing to hold. So off went the Emperor in

procession under his splendid canopy. Everyone in the streets and the windows said, "Oh, how fine are the Emperor's new clothes! Don't they fit him to perfection? And see his long train!" **Nobody would confess that he couldn't see anything, for that would prove him either unfit for his position, or a fool.** No costume the Emperor had worn before was ever such a complete success.

**[Finally], a _little_ child said "But the emperor has no clothes"**

And one person whispered to another what the child had said, "He hasn't any clothes on. A child says he hasn't anything on."

"But the emperor has no clothes!" the whole town cried out at last.

The Emperor shivered, for he suspected they were right. But he thought, "This procession has got to go on." So he walked more proudly than ever, as his noblemen held high the train that wasn't there at all.

*Figure 1 Adapted from the story the Emperor's New Clothes  by Hans Christian Andersen (1837), illustration by medium.com*



The relevance of the allegory to this certiorari is that it is taking an African woman from a "third world" country that is supposed to looking up to America as the emblem of democracy in the "First world," to expose the blatant corruption within the American judiciary. Like in the story where the swindlers pretend to be weaving fabrics all night and making grand displays in the air of cutting imaginary fabrics with scissors, these judges pretend to be working to uphold equitably the US Constitution in service of the people.  Whereas they wield immoral torts branded as appropriate judicial acts by writing lavish opinions and orders justifying her unconstitutional acts; for example, Dabney Friedrich wrongfully computes time and dismisses complaints as non-cognizable so she can justify stupid orders that make a mockery of a sacred office and profession.  Such torts cripple the country from healing from the shame of slavery and truly progressing.  These self-proclaimed liberal judges brandish a banner of progressivism because it allows them to protect non-evidence-based ideologies, guised as freedom, while failing to adequately address deep structural issues that oppress the human rights, such as access to quality education, quality healthcare and a right to receive dignified pay for one's work, mate and raise a family, practice religion fairly without governmental encroachment.

In Nigeria, being a relatively nascent democracy and coming out of military dictatorships, one would expect corruption in the judiciary, yet the plaintiff has been able to win highly controversial cases showing that even in seemingly hopeless situations, and in less economically developed countries, judges are not completely bereft of upholding the law, even at the expense of societal norms and political pressures. By contrast, wherein America holds itself out to be the emblem

31

of democracy, it is shocking and disappointing that the judges themselves would rather parade nude with their fallacious orders than clothe themselves in the words and spirit of the U.S constitution, just to protect their colleagues, false ideologies of white superiority and dangerous gender dogma that's inconsistent with life and contrary to human dignity. It would appear thus, the very dictatorial conduct the democratic judges accuse the republican presidential candidate of reinstating, is the conduct they carry out themselves, oppressively jettisoning the U.S. Constitution and a government for the people, to abuse power and serve themselves. Thus, akin to the allegory of the Emperor's new clothes, these judges/ "noblemen" conduct in the plaintiff's/appellant's cases demonstrate how their participation in vain folly has stripped America of its democratic spirit and values.

*Figure 2 Figure 3 Thomas Jefferson's Memorial, excerpts from the declaration of Independence*



*We Hold These Truths to Be Self-Evident: That All Men Are Created Equal. That They Are Endowed by Their Creator with Certain Inalienable Rights. Among These Are Life, Liberty and The Pursuit of Happiness, That To Secure These Rights Governments Are Instituted Among Men. We Solemnly Publish and Declare, That These Colonies Are And Of Right Ought To Be Free And Independent States. And For The Support Of This Declaration, With A Firm Reliance On The Protection Of Divine Providence, We Mutually Pledge Our Lives, Our Fortunes And Our Sacred Honour.*

- Thomas Jefferson

## VIII.  SUMMARY OF THE PLAINTIFF'S CASES AND JUDICIAL
## INFRINGEMENT OF FUNDAMENTAL FREEDOMS

*1.  Education* - Nwosu v. Yale University et al

In her 2017 medical school interview with a physician Emeritus, the physician asked the plaintiff, why do you want to go back to Nigeria after your medical degree, we need you here? At the time the plaintiff who was a young interviewer thought Nigeria's problems were far greater than America's and thought Nigeria needed more institutional reform especially in health policy. However, in her 2023 note to the Dean of Admissions at Yale, Laura Ment, the plaintiff wrote she intended to pursue the MD/JD degree to instigate institutional reform within the U.S. having experienced the ugliness of racial discrimination. Laura Ment, unilaterally proceeded to promptly halt the plaintiff's application on May 4th 2023, although the plaintiff had received 6 solid recommendation letters for directors of residency programs, lead researchers from top universities across the country, all backing her candidacy. The case involves title VI violation, 1983 color of law violations, negligence, gross negligence and fraud claims brought against institutions and their evident co-conspirators within the justice department and department of education to suppress illegal medical admissions practices that abuse the faith and trust of unsuspecting candidates. Although the plaintiff brought the discriminatory grievances against Yale University to the office of civil rights, the office of civil rights negligently misrepresented and fraudulently concealed key elements of the plaintiff's case. Ultimately Gilian Thompson, Meghan

34

McCrea and Jill Siegelbaum, shelved the plaintiff's appeal indefinitely, and worked with the United States Justice Department, directed by a Yale graduate, Ms Shaheena Simons and Kristen Clarke, to conceal the fact that Yale had been operating the Boston Department of Education's complaint phone lines, where complaints against it were being lodged.

The case is relevant to public policy because it showcases that the very governmental institutions set up to uphold the constitution are infiltrated corrupted by the private institutions themselves, so those institutions can't function.

2. *Religion* - Nwosu v. Bolduc et. al

The plaintiff is a Catholic and was born into and African Catholic family. In 2023, she went on a pilgrimage to Israel, with a racist nun, Magdalit Bolduc, as her tour guide. Magdalit trolled the plaintiff everyday of the 14 day pilgrimage, and eventually slandered her to the point of convincing her former partner, who was a former member of Magdalit's ecclesiastical community, the community of the beatitudes, to perjure himself to protect her from the plaintiff. Unfortunately for this racist nun, the plaintiff had a recording of their interaction, and it was clear that there was no harassment and Magdalit had pulled a "Karen" i.e. the colloquial term given to "white: persons who weaponize racial hate against black people by calling the police on them for crimes they did not commit[6]. The Greek word for devil: Diabolos, means slanderer, and that's who Magdalit evidently was to the plaintiff, a slanderer

---

[6] Former NFL star speaks out after United Airlines arrest and removal following fraudulent reporting by flight attendant https://youtu.be/RC8o3FOLHdE?si=DEEPnLZaZJaxjCup

and civil murderer to Ms Nwosu's life and liberty. Ms Nwosu dismissed the perjured order and sealed it. Apparently, Magdalit's illicit and discriminatory actions towards her was fueled in part by becoming romantically involved with a former member of their community, who was white, and whom the plaintiff had advised him of the oddity of desiring to sell off assets to live a life of poverty, as a way of pleasing God. He would express mild displeasure at the plaintiff for not wishing to follow suit. Significantly, the French government had already investigated this cultist practices of the Community of the Beatitudes for psycho manipulating its members, dividing families and forcing them to sell off their assets; the scandal was published in newspapers and included in the amended complaint, which Judge Dabney dismissed and refused to reopen. In 2023, under the Vatican's probation, the community of the Beatitudes said they would form an independent committee to help them navigate their "troubled past," Including the sexual abuse of minors by the community's founder.

*Figure 3 painting of sister magdalit on the sea of galilee on April 27 2023 strangling herself with chains because next to her were the black plaintiff and her community member, Mr Johnson, earlier that day Magdalit almost lost her balance when Jeffrey asked her to take a photo of both of them. Portrait painting by Eileen Campbell who painted the portrait as a catharsis following sister's Magdalit's abusive words to her while on the pilgrimage.*



This case is relevant to public policy because when the plaintiff brought the suit against Sister Magdalit in D.C, judge Dabney Friedrich, aided by clerk

36

Michelle Grady, ran to sister Magdalit's rescue to protect her, notwithstanding Ms Nwosu's constitutional rights to a fair hearing. Dabney insistently denied the plaintiff's statutory right to amend her complaint and bring in the apostolic Nuncio, located in D.C, as the reporting headquarters for the Catholic institution in the U.S, despite the plaintiff's motions for reconsideration. The case is on appeal, and the appellate court, is trying very hard to dismiss the appeal, even manipulating the plaintiff's filings and intentionally mis-docketing the filings, so the case can be dismissed. When the plaintiff held Scott Atchue and Alison Grossman of the D.C appellate court accountable on August 14 2024, they retaliated against her, dismissing her other interlocutory appeals for other cases on the same day (see appendix A). The plaintiff has since moved to reinstate all those ill-motivated dismissals, yet nothing has been done by the federal court of appeals. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988))..

The case is further important for public policy because the United States guarantees first amendment rights to practice religious freedoms, in so far as they do not endanger citizens, and violate the laws of the land as in this case. As a Catholic, who respects the dignity of human lives, it is shameful that abuse and discrimination against black Catholics is being protected by white Catholics at every level within the Catholic church and remedies for judicial recourse are being quashed by white judges. Had this been a complaint of sex scandal and abuse against (white) minors by Catholic consecrated and clergy, the response would be different. Thus, this case is of import, because *black lives matter*.

37

3. *Wealth Preservation – Nwosu vs. Deutsche Bank AG*

In this case, Deutshe Bank is withholding considerable assets belonging to Ms Nwosu's. It seems apparent the bank is hoping this would have been a case where African money is lost in Swiss/ European banks. Under judges like Milton Lee, whose slave ridden history cannot let him stand up to white institutional oppression, they almost got away with their illegal acts. Ms Nwosu has simply asked for her property, through which is Deutsche Bank is being unjustly enriched and withholding fraudulently. In this suit, judge Milton delivered the most incoherent judgment turning the basic tenants of common law on its head, by stating he was not convinced that the District of Columbia had jurisdiction over the defendants, who were operating in D.C , because of the plaintiff's ethnicity. Alas, such shocking contraventions of law, is what the plaintiff has to endure with forbearance in order to not only travail in her pursuits. These sort of cases, show the realities of the allegory and provide testimony to the evident fractures in the judicial system that make it the *injustice* system. *Sanchez v. City of Fresno, 914 F. Supp. 2d 1079, 1099 (E.D. Cal. 2012)*

4. *Wealth generation – Nwosu vs. Four Seasons LTD,*

The plaintiff brought a suit against the Four Seasons hotels for breach of contract, unfair business practices and discrimination, after the plaintiff found that the hotelier failed to repeatedly meet the expectations of the written lease contract which both parties had entered into in December 2023 and March/ April 2024. Additionally, the plaintiff found evidence in December 2023 – April

38

2024, that the Four Seasons LTD, founded and headquartered in Canada, is actually a racist institution, that willingly extracts monies from black consumers but intentionally blocks wealth generation avenues engaging in unfair trade practices, in favor of white consumers. In particular, the executive team of the Four Seasons fraudulently misrepresented that their gallery space wherein they are landlords on Pennsylvania Avenue was unavailable, knowing the plaintiff had wished to rent it at $150,000+ annually to showcase contemporary African art, that would help change the stereotypes of poverty, war and debasement. Such prejudiced narratives oft promotes prejudice, condescension, ignorance, and racism in the West. The vice president of the Four Seasons, Mr Bernard and the Marketing Director, Mr Austin Philips, repeatedly wrote to Ms Nwosu that the space would not be available, misleading information which the incumbent tenant and gallerist refuted. The incumbent gallerist displayed French renaissance artists, including Monet and Renoir, which the Four Seasons appreciated so much they extended the rent free tenancy of the incumbent Guarisco gallery, depriving Ms Nwosu of the space. It was not until Ms Nwosu amended her complaint in April 2024, showing that the discrimination and unfair business practice was ongoing, that the incumbent gallerist vacated the space and rebranded the vacant space with Four seasons awnings.

This case is relevant to public policy because of how judge Cooper sought to protect the Four Seasons' discriminatory, breach of contract and unfair business practices acts, prejudicially. The plaintiff's art gallery showcase would have been a clear opportunity to educate people, promote intercontinental

39

trade at a location that already welcomes international diplomats, and could serve to promote true inclusivity and respect of other cultures. Opening up international art galleries at exclusive locations also promotes wealth generation for the international artists, and has corollaries such as improving access to health, education in their countries for families. Indeed one of the multiplier effect of global prosperity is that there is less pressure on migration into the West, as people are able to use the incomes from bilateral trade to build up their lives in their own countries. Judge Cooper blocked this large scale vision through his myopic prejudicial acts of preserving the status quo unjustly. Ms Nwosu had asked for injunctive relief for her evident breach of contract claims, and also moved for summary judgement after the defendants defaulted and were genuinely delaying the case without a real defense. Ms Nwosu had also moved for sanctions following the repetitive motions by the opposing party delaying the case unnecessarily. Judge Cooper, prejudicially struck out her motion for summary judgment, did not rule on the sanctions motions, and after four months he was still indecisive on whether the plaintiff had a claim to dismiss pursuant to rule 12b. On May 30 2024, Ms Nwosu filed a restraining order against judge Cooper after she discovered he had ruled prejudicially in the face of overwhelming evidence on a similar discrimination case involving a black plaintiffs and against a white run George Washington University – see *Stafford v. George Wash. Univ.*, Case No. 18-cv-2789 (CRC) (D.D.C. Jun. 5, 2019) *Jabari Stafford v. George Washington University, No. 22-7012 (D.C. Cir. 2022)*. Although Ms Nwosu's case went on appeal, it has been temporarily blocked by the mischief of the clerk staff in the D.C Court of appeals, who had informed Ms Nwosu that

40

her case was under review and failed to mention that they were awaiting an IFP waiver. At the least opportunity to retaliate, they struck out her case, and she has since filed her motion to reconsider the retaliatory decision. Thus, the appellant invokes the supervisory oversight of the supreme court given that the entire DC circuit is corrupted and unable to deliver justice blindly.

5. *International Development – Nwosu vs. Hewlett Packard Enterprise Co.*

Ms Nwosu had been forced to bring a suit against Hewlett Packard Enterprise Co (HPE) in January 2024, after her transaction to purchase printing equipment for her new print business was abruptly halted by the anti-trust/competition structure in which HPE had structured the African market. Essentially HPE's/HPInc's market for printers, data cloud and software was such that Ms Nwosu would have to purchase equipment from Middle Eastern owned businesses, moving hundreds and thousands of dollars out of the African economies and into the Middle East. She refused because she had already invested in relationship building with South African authorized dealers, and given that part of her mission as a businesswoman was to lift people out of poverty. The plaintiff is sick and tired of witnessing people in her country of Nigeria prostrating before the Blessed Sacrament for hours, begging Jesus Christ for money. In the U.S it is equally painful to watch black men, who have been let out of jail with nowhere to go sit at the footsteps of Catholic churches, homeless, wondering if they can come in or not, and just watching the world pass them by or give them a meagre dollar.

The Uruguayan born immigrant judge Ana C. Reyes decided to block Ms Nwosu's case and parry with the defendants, denying all of the plaintiff's motions, including her motion for summary judgments after the defendants pled no defense in their answer, and then extended the time for the defendants to cook up a response to Ms Nwosu's evidence packed motion and legal memoranda in support.

Besides the blow to international development by Ana's selfish, unjust and oppressive acts, Ana's actions to remain on the case are undoubtedly unconstitutional because she is conflicted. Rather than recuse herself, where she in named party in another of the plaintiff's case, for lying that she was under no obligation by judicial code of ethics/conduct to hold her fellow judge Dabney Friedrich accountable, who denied the plaintiff a statutory right (aforementioned), she remained on the case, writing self-gratifying legal opinions and orders deeming the plaintiff's suits as frivolous and hurling insults at the US constitution's equal rights to due process and a fair hearing.

6. *Judicial Accountability - Nwosu vs. Friedrich et al.*

Given the shocking and unconstitutional manner in which the federal judges selectively elect to apply the law along racial lines in detriment to the plaintiff, even acting in the absence of all jurisdiction to maliciously and intentionally breach statutory provisions, Ms Nwosu filed suit against judicial colleagues Ana C. Reyes and Dabney Friedrich, as a recourse for judicial accountability, a path to a fair hearing and a reminder of their oath to uphold the 14th amendment, not abuse their authority and run the judiciary like their

personal homes. The U.S attorney, Jane Lyons motion to dismiss filed on July 2024, refuted that the judges were bound by the judicial code of conduct and an affirmation of their illegal conduct and license to misbehave. Eliminating such an abuse of power is of import to restoration of the public's faith in the judiciary, especially in criminal justice cases, where the like of Judge Amy Jackson, Dabney, Ana Yvonne, Cooper are selective applying laws along racial lines and contributing to the mass incarceration of black men. They negligently and intentionally misrepresent facts of the case, jettison guaranteed statutes, and wield laws as they please. This leads to all manner of injustices, including exempting their friends and colleagues from the grips of the law, while instituting a modern type of slavery by blocking access to wealth generation . breaking families, putting unbearable pressures on black women and robbing descendants of Africans opportunities to build families in a stable home, create wealth across various industries, not just predominantly the entertainment industry. Furthermore, their oppressive and unjust applications of law, force minorities to believe they have to change their bodies and personas to contend with ideologies that implore them to become who they really are by transforming themselves. In part, the inequitable application of the law by judges has fueled the underground transgender community, wherein black men turn into "female" sex workers[7] for straight white males on the "down-

---

[7] <u>Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major U.S. Citie</u>s

43

low"8,910 to in part can escape incarceration, unjust police brutality and/or economically advance as they are deemed less menacing and more palatable to their white peers. Thus, under the guise of permitted progressivism, by going into areas that are applauded and not blocked, as the plaintiff is experiencing, these disenfranchised populations can afford to earn a living, however un-dignifying. Thus the "pride" and "freedom" to "love" whoever one wants to love is but an illusion; a forced modern-day slavery, wherein disenfranchised population are operating within a very short radius afforded by the judiciary system, to be able to earn an income. The irony is, while white females, such as these judges openly wield oppressive tactics in court against blacks, in a quest for never ending power, control, assertion and dominance to be co-equals with their masculine peers, their husbands within the personal space quietly disdain the encroachment on their masculinity and rebel through disordered sex addictions, such as pornography, extramarital affairs, men who have sex with men, transgender sex work et cetera, some tales of which are recounted in the Oscar awarded film Maestro, portrayed by Bradley Cooper, and which the plaintiff witnesses firsthand in "luxury" hotels. The emperor is very naked. These plaintiff's experiences of judges shutting down and limiting her opportunities: clamping down her access to wealth, even when she is entitled, affirms the unconstitutional practices of limiting growth of and retarding the socio-economic advancement of non-white persons, akin to the apartheid and

---

8 Unique Obstacles Put Transgender People At Risk of Trafficking
9 Kumar, Navin Scott, John and Minichiello, Victor 2017. *Masculinity and the Occupational Experience of Male Independent Escorts Who Seek Male Clients*. Social Sciences, Vol. 6, Issue. 2, p. 58.
10 1. Logan TD. *Economics, Sexuality, and Male Sex Work*. Cambridge University Press; 2017.

Jim Crow. It is as though these white women, aided by sedition of their black peers, loathe to see someone who would've been "the help" at their "nana's" dinner table, socially advance and sit in front of the bus.

## IX.    WHY THIS WRIT SHOULD BE GRANTED

The plaintiff's cases transgress the fundamental freedoms guaranteed by the U.S. Constititution and actually help improve lives nationally and internationally: the right to practice religious freedoms, the right to life, the right to property, through wealth generation and preservation. The plaintiff/appellant, who has boldy not put up with the guiles of judges seeking to protect the status quo even when it violates the constitution, has been blackwalled from appealing her cases in the D.C. court of appeals as the courts have evidently conspired to mis-docket and dismiss her cases illicitly. The District of Columbia judicial system evidently runs like a club, wherein ex-parte communications among judges and counsels are rife, and law is oppressively wielded against non-conforming parties, and the consittuional provisions and statutes are relegated to the erratic rules of unfaithful judges to the U.S. Constitution. The plaintiff files this extraordinary writ as she is unable to exercise her right of appeal, without mischief, and thus has to invoke this court's supervisory power to safeguard the constitutional protections afforded persons subject to the U.S. jurisdiction thereof.

## X.    CONCLUSION

The plaintiffs' cases which have been unjustly estopped by extra-judicious abuse of power in the D.C circuit in a manner that obstructs justice and shocks the conscience. *Braatelien v. United States, 147 F.2d 888 (8th Cir. 1945). Hogan v. City of El Dorado, 455 F. Supp. 2d 876, 884 (W.D. Ark. 2006).* Under the Supremacy Clause of Article VI, and the fourteenth amendment due process and equal protection clauses, the plaintiff calls on the Supreme Court to invoke its supervisory power in this extraordinary writ because the judges actions are treasonous and fraudulent, in that they took an oath of office to uphold the US Constitution, yet their <u>repeated</u> and <u>continuous</u> actions mockingly robs the emperor of his clothes, under the pretence of law,  progressivism and illusionary freedom. It is overwhelmingly evident that the judges in the District of Columbia have sought to deny the plaintiff of any recourse to judicial remedies, in reckless disregard of constitutional provisions. It is important to grant this extraordinary writ of certiorari as failing to do so will create a back door through which the government can effectively steal and deprive people of their life, property rights, and liberties, unconstitutionally The plaintiff ultimately files this extraordinary writ of certiorari to restore faith in the judicial system, to bar the callous violations of constitution by state and federal judges in the District of Columbia and restore her freedom to life liberty and property which have been denied her unjustly. The appellant is seeking reliefs on her summary judgement in her cases, as well as judicial reform to stop marring the principles and spirit of the US constitution.

*Figure 4 Excerpts from Thomas Jefferson's Memorial*



I Am Not an Advocate for Frequent Changes In Laws And Constitutions. But Laws and Institutions Must Go Hand In Hand With The Progress Of The Human Mind. As That Becomes More Developed, More Enlightened, As New Discoveries Are Made. New Truths Discovered and Manners and Opinions Change, with The Change of Circumstances. Institutions Must Advance Also to Keep Pace with The Times. We Might as Well Require a Man to Wear Still the Coat Which Fitted Him When a Boy as Civilized Society To Remain Ever Under The Regimen Of Their Barbarous Ancestors.

- Thomas Jefferson

47

## XI.    LIST OF RELATED CASES AND STATUS OF THE CASES

Proceedings originating in District of Columbia Superior Court

1.  2024-CAB–000736

    1.1. 1:24-CV-00615-ACR (illicity removed to the district court without due

    process)

    1.1.1.  24-7087 (on appeal to US Court of appeals for D.C Circuit; motion to

    reinstate appeal filed after it was illicitly dismissed in retaliation by

    Scott Atchu)

2.  2024-CAB-003433

    2.1. 1:24-CV-01852-CJN (illicity removed to the district court)

    2.1.1.  24- 5171 (on appeal to US Court of appeals for D.C. Circuit; motion

    to reinstate appeal filed after it was illicitly dismissed in retaliation

    by Scott Atchu)

3.  2024-CAB- 000293

    3.1. 24-CV-482 ( on appeal to the D.C court of appeals for a unconstitutional

    dismissal that contravenes common law).

Proceedings originating in the Federal District Court for the District of Columbia
4.  1:24-CV-00025-ACR

    4.1. 24-7092 ( on interlocutory appeal to D.C. Court of appeals; motion to

    reinstate appeal filed after it was illicitly dismissed in retaliation by Scott

    Atchu)

5.  1:24-CV-00064-ACR

     5.1. 24-7091 (on interlocutory appeal to D.C. Court of appeals; motion to reinstate appeal filed after it was illicitly dismissed in retaliation by Scott Atchu)

6. 1:23-cv-03841-DLF

     6.1. 24-7034 (on appeal to the D.C. Court of appeals; appellant has at least temporarily stopped an illicit dismissal after repeated attempts by members of the clerk's office, through intentional misdocketing of her filings).

7. 1:24-CV-878-ACR

     7.1. 24-5124 ( on appeal to the D.C. Court of appeals; appellant's motion to consolidate this appeal with 24-7034 has been filed, given it originated from similar facts).

8. 1:24-CV-00987-CJN

     8.1. On interlocutory appeal to the D.C Court of appeals – no case number issued yet


Respectfully Submitted,

*Adaeze Nwosu*

Adaeze Nwosu, Pro Se
23 Aug 2024


49

## XII.   APPENDIX A - ORDERS

| | | |
|---|---|---|
| 1. | 1:23-cv-03841-DLF | Order by Dabney dismissing plaintiff's suit for alleged lack of jurisdiction and Dabney's order Denying plaintiff's motion to reconsider and exercise statutory provisions to amend her complaint, as "non a cognizable motion" <br> Dabney's orders twice denying plaintiff's motion for recusal |
| 2. | 1:24-CV-878-ACR | Ana's order dismissing case brought against Dabney for her statutory violations and acting in the absence of all jurisdiction, citing holding her colleague accountable for misconduct, was not a claim upon which a relief can be granted, despite it being stated explicitly in the judicial code of conduct |
| 3. | 2024-CAB - 000736 | Superior Court's notice of transfer of the plaintiff's suit to district court without adequate notice and granting the plaintiff time to file an opposition, and yet without even considering the plaintiff's opposition to the transfer, in violation of due process. |
| 4. | 1:24-cv-00615-ACR | Judge Ana Reyes order denying a recusal, cases given her conflict of interest <br> Judge Ana Reyes denying remanding the illicitly transferred suit 2024-CAB – 000736; judge Reyes waited over 4 months to decide plaintiff's motion to remand the plaintiff's motion filed in April 2024. Judge Reyes has a history of cherry picking which judicial code of conduct would apply to her and her fellow judges, when it best favors them, and subsequently adjudicates, delay cases, grant stays under color of law, in a manner that is inherently prejudicial and conflicted with her interests |
| 5. | 1:24-CV-00064-ACR | Ana's orders denying certification for interlocutory appeal though she was conflicted and evidently prejudiced, and Ana's order denying motions for recusal. <br> Ana's order denying plaintiff's motion for stay pending review of interlocutory appeal <br> Ana's order denying plaintiff's motion for sanctions after defendant lied unethically to dismiss her case <br> Ana's order granting defendant's motion for extension of time |
| 6. | Appeal Case No. 24-5171  and 24-7087 | Order by Appeals court operations manager, Scott Atchue dismissing appellant's case for failure to prosecute on August 14 2024, which was done in retaliation after the appellant wrote to hold them accountable and stop intentionally mis-docketing her briefs, in order to dismiss them. |
| 7. | 2024-CAB- 000293 | Judge Milton's order dismissing plaintiff's suit based on the jurisdiction of the plaintiff |
| 8. | 1:24-CV-00025 | Christopher's order to strike plaintiff's motion for summary judgment |

## XIII.  APPENDIX B – PLAINTIFF'S APPEALS

This appendix includes plaintiff's Interlocutory appeals, motions for

reconsiderations and motions to vacate judgment, and questions of law, which

were all non-frivolous as they carried constitutional weighting vis a vis judicial

practices.

<u>CERTIFICATE OF SERVICE</u>

I certify I served the following writ of certiorari via postal mail and PACER on

the respondent's attorneys, the US State Attorney and the State Attorney's

Office for the District of Columbia.

Adaeze Nwosu,
Petitioner,
23rd August 2024
ireoma@gmail.com
1802 Vernon Street, Washington DC 20009, STE 508

51